UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

MARSHA GAYLES,                               )
                                             )
            Plaintiff,                       )
                                             )
      v.                                     )      Case No. 1:22-cv-00750
                                             )
ROSWELL PARK CANCER INSTITUTE                )
CORPORATION d/b/a/ ROSWELL PARK              )
CANCER INSTITUTE,                            )
                                             )
            Defendant.                       )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS**
(Doc. 7)

Plaintiff Marsha Gayles ("Plaintiff") brings this action against Defendant Roswell Park Cancer Institute Corporation, d/b/a Roswell Park Cancer Institute ("Defendant"), alleging that Defendant discriminated against her on the basis of her race and her status as a caregiver for a child with a disability by refusing to allow her to work remotely during the COVID-19 pandemic. Pending before the court is Defendant's November 23, 2022 motion to dismiss Plaintiff's Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 7.) Plaintiff opposed the motion on January 19, 2023 (Doc. 14), and Defendant replied on February 3, 2023. (Doc. 15.) The court held a hearing on the motion on April 24, 2023, at which time it took the motion under advisement.

Plaintiff is represented by Kevin P. Wicka, Esq., and Nicholas Paul DeMarco, Esq. Defendant is represented by Amanda L. Lowe, Esq., Chloe J. Nowak, Esq., and Tara Marie Ward, Esq.

**I.      Procedural Background.**

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about September 14, 2020. The EEOC submitted a copy of

the charge to the New York State Division of Human Rights. Following an investigation into Plaintiff's allegations, the EEOC issued Plaintiff a Notice of Right to Sue dated July 6, 2022.

On October 3, 2022, Plaintiff filed a Complaint in this court asserting six causes of action: race-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) (Count I), the New York State Human Rights Law ("NYSHRL"), Executive Law § 290 (Count II), and 42 U.S.C. §§ 1981 and 1983 (Counts III and IV), as well as disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12201 (Count V), and the NYSHRL, Executive Law § 290 (Count VI).[1] Plaintiff seeks two million dollars in actual damages for loss of income, including back pay, front pay, reimbursement for lost and future pension payments, social security, and other past and future benefits; mental anguish, emotional distress, and embarrassment; compensatory damages; and punitive damages, as well as attorney's fees and costs and any other and further relief the court deems proper.

**II.    Allegations in the Complaint.**

Plaintiff is a resident of the State of New York. Defendant is a public corporation established by statute under New York law. *See* N.Y. Pub. Auth. Law § 3553.1(a) ("There is hereby created a corporation to be known as the Roswell Park Cancer Institute corporation which shall be a body corporate and politic constituting a public corporation."). At all times relevant to the Complaint, Defendant was an "employer" as defined by the ADA and the NYSHRL.

Defendant is "self-funded" and "not under significant state control[,]" with the exception of the appointment of its directors by the government and elected New York State officials. (Doc. 1 at 3, ¶ 14.) As a legal conclusion, Plaintiff alleges that "New York is not liable for payment of any Roswell Par[k] bonds or notes" or "budget deficits"; "no New York statute indicates Roswell Park is structured in any other way than to be self-

---

[1] Plaintiff withdrew her claim for disability discrimination in violation of the NYSHRL, Executive Law § 290. *See* Doc. 14 at 7 n.1.

sustaining"; and no "provision of state law make[s] New York responsible for debts or other liabilities, such as judgments or budget deficits, incurred by Roswell Park either directly or indirectly." *Id.* at 3-4, ¶¶ 15-16.

Plaintiff began working for Defendant on October 26, 2017 as Dr. Willie Underwood III's Executive Assistant in the Department of Urology and served in that position until April 20, 2019. When Plaintiff was hired, Dr. Underwood allegedly was the only African American urologist employed by Defendant and was engaged in a lawsuit against Defendant asserting race-based discrimination, hostile work environment, and retaliation claims under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Plaintiff allegedly "experienced hostility from employees of Defendant as a result of her association with Dr. Underwood." (Doc. 1 at 5, ¶ 27.) When Dr. Underwood's employment with Defendant ended in 2019, Defendant transferred Plaintiff to its Case Management Department where she was the only African American employee, as well as the only person of color.

In March 2020, at the beginning of the COVID-19 pandemic, Defendant offered some employees the opportunity to work remotely and "made accommodations for employees who were high risk or who had school[-]aged children" attending school remotely. *Id.* at 5-6, ¶ 30. Beginning on or about March 16, 2020, Plaintiff asked her supervisor, Patricia Czamara, if she could work remotely to care for her ten-year-old son, who was at "high[ ]risk" for COVID-19 due to his disability[2] and whose school had moved to online instruction. Ms. Czamara responded that she "would give it some thought." *Id.* at 6, ¶ 31 (internal quotation marks omitted). At the end of March 2020, other employees who had similar duties to Plaintiff's were allowed to work remotely, including but not limited to an Executive Secretary in another department, who is "Caucasian[.]" *Id.* at ¶ 32.

Plaintiff alleges that in late March or early April 2020, Ms. Czamara tasked her with coordinating with Defendant's IT Department so that all employees in the Case

---

[2] Plaintiff does not describe the nature of the disability in her Complaint.

Management Department could work remotely. The IT Department ordered a laptop for Plaintiff, but when Plaintiff asked Ms. Czamara about the laptop in or about mid-April 2020, Ms. Czamara replied that Plaintiff would not be allowed to work remotely due to the "needs of the department[.]" *Id.* at ¶ 34 (internal quotation marks omitted). Ms. Czamara denied Plaintiff's request to work from home, told her that she was "not comfortable with Plaintiff working and answering calls from home," and that Plaintiff could either take a "leave of absence" or use her accrued paid leave time. *Id.* at ¶ 35.

According to Plaintiff, "[a]lmost all" of her "essential duties" were administrative and could have been performed remotely. (Doc. 1 at 7, ¶ 38.) Other Caucasian employees in Plaintiff's department were permitted to work remotely and did so, as did other Caucasian administrative assistants employed by Defendant. Plaintiff alleges that she was not permitted to work remotely due to her race.

Because she was not allowed to work remotely, beginning on or around May 1, 2020, Plaintiff worked in the office every Wednesday through Friday but otherwise "was required to utilize leave time." *Id.* at 7, ¶ 41. Plaintiff asserts that she "was humiliated, embarrassed[,] and subjected to emotional distress by being forced to use all of her paid leave time, and then being forced to use unpaid leave time once her paid time had expired, while her Caucasian co-workers were allowed to work remotely and not use their leave time." *Id.* at ¶ 43. Although she complained to Human Resources, she was told that the decision to approve or deny remote access was left to her supervisor's discretion. Human Resources allegedly did not investigate Plaintiff's complaints nor did it advise her to report her concerns to Defendant's Department of Diversity and Inclusion.

Plaintiff alleges that she felt "exhausted and frustrated" due to Defendant's lack of response to her complaints and due to "covering for her department, the Social Work [D]epartment, and trying to meet the needs of her family, all the while worrying about being exposed to C[OVID]-19." *Id.* at 8, ¶ 47. She had a close contact with a co-worker who had COVID-19 and was required to work at a station close to the tubing system through which Defendant sent COVID-19 tests. On several occasions, Plaintiff was advised by a case manager that a clinic staff member who had been processing COVID-

4

19 tests had used Plaintiff's desk and phone. Plaintiff allegedly "had to constantly disinfect her work area and phone[,]" and suffered "extreme emotional distress" due to her concerns about exposing her high-risk son to COVID-19. *Id.* at ¶¶ 51-52.

On May 29, 2020, Ms. Czamara allegedly told Plaintiff that she would be required to return to the office full-time beginning on June 15, 2020. Due to Defendant's failure to address her discrimination complaints and the "extreme emotional distress to which she was subjected," Plaintiff wrote a three-page resignation letter in which she complained of racial discrimination. *Id.* at ¶ 53. On June 10, 2020, she sent the letter, which was effective June 24, 2020, to her immediate supervisor, her supervisor's supervisor, the Vice President for Human Resources Errol Douglas, and Defendant's Chief Executive Officer Dr. Candace Johnson.

Mr. Douglas informed Plaintiff that he had received her letter and that the Director of Diversity and Inclusion, David Scott, would reach out to her. Mr. Scott met with Plaintiff on June 17, 2020. Plaintiff asserts that Mr. Scott did not acknowledge Plaintiff's complaints to her supervisors and Human Resources and "made no attempt to convince [her]" that her discrimination complaints would be investigated or urge her to continue working for Defendant. (Doc. 1 at 9, ¶ 55.) He, instead, advised her "there are difficult situations everywhere" and "it does not get better than Roswell." *Id.* Plaintiff alleges that she "was constructively discharged from her employment with Defendant on June 24, 2020." *Id.* at ¶ 56 (internal quotation marks omitted).

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Id.* (internal quotation marks and citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

**B.  Whether Plaintiff States a Claim for Racial Discrimination Under Title VII and the NYSHRL.**

Both Title VII and the NYSHRL prohibit discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1); N.Y. Exec. Law § 296(1)(a). Claims for race-based discrimination under the NYSHRL are analyzed in the same manner as Title VII claims. *See Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008), *as amended* (Apr. 22, 2008) ("We typically treat Title VII and NY[S]HRL discrimination claims as analytically identical, applying the same standard of proof to both claims.").

> [A] Title VII claimant may establish an employer's liability under the statute by showing either (1) "that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of [his] race, color, religion, sex, or national origin" (*i.e.*, a "discrete act" claim), or (2) that he was subjected to harassment on account of one or more of the above bases that amounted to a "hostile work environment" (*i.e.*, a "hostile work environment" claim).

*Tassy v. Buttigieg*, 51 F.4th 521, 529 (2d Cir. 2022).

1.    **Whether Plaintiff Plausibly Alleges an Adverse Employment Action.**

To assert a race discrimination claim, a plaintiff must allege:

(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation[.]

*Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). Defendant acknowledges that Plaintiff is a member of a protected class. It does not contend she was unqualified for her position. Rather, it argues that Plaintiff's Title VII and NYSHRL race discrimination claims must be dismissed because she fails to allege an adverse employment action or a plausible inference of racial discrimination.

An "adverse employment action" requires the plaintiff to have "suffered a materially adverse change in his [or her] employment status or in the terms and conditions of his [or her] employment[.]" *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (alteration adopted and internal quotation marks omitted). It must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Tassy*, 51 F.4th at 529 (internal quotation marks omitted). "Examples include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Id.* at 529-30 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)); *see also Little v. State of N.Y.*, 1998 WL 306545, at *5 (E.D.N.Y. June 8, 1998) ("The realities of the workplace dictate that employees do not always have the option to work in the location they desire. Employees must often go where the employer determines they are needed most."), *aff'd sub nom. Little v. State*, 173 F.3d 845 (2d Cir. 1999).

Plaintiff alleges that she experienced adverse employment actions when she was constructively discharged, "denied the benefit of working remotely[,]" "required to use her paid leave time and unpaid leave time[,]" and "required to return to the office after complaining to Defendant's Human Resources Department." (Doc. 14 at 17.) Defendant

counters that an adverse employment action cannot be found on any of the cited bases, independently or collectively.

Prior to the COVID-19 pandemic, courts in the Second Circuit generally found that denying an employee's request to work remotely was not an adverse employment action.[3] Many of these courts grounded their decisions in the rationale that an employee's ability to work remotely was a matter of convenience. *See, e.g., Ray v. N.Y. State Ins. Fund*, 2018 WL 3475467, at *11 (S.D.N.Y. July 18, 2018) (noting "the mere inconvenience of working from a different location does not, without some other impact, rise to the level of an adverse employment action" and finding that preventing plaintiff from working remotely "denied her a convenience by merely requiring her to work from her normal working location"). None of the cases cited by Defendant, however, considered remote work in the context of the COVID-19 pandemic when the ability to work remotely was intertwined with legitimate public and personal health and safety concerns. Nor did they consider situations in which some employees were permitted to work remotely while similarly situated employees were not.

Although Defendant cites two cases from 2020 and 2021 to support its argument that "post-pandemic case law follows precedent and holds that denying a request for remote work is not an adverse employment action because it did not change the terms and conditions of Plaintiff's employment[,]" the adverse actions alleged in those recent cases occurred well before the pandemic. (Doc. 15 at 6) (internal quotation marks omitted); *see also Williams v. PMA Co.*, 564 F. Supp. 3d 32, 46 (N.D.N.Y. 2021) (alleging

---

[3] *See, e.g., Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 12 (2d Cir. 2013) (holding employer's refusal to permit plaintiff to take advantage of alternative works schedule allowing "periodic work from home" was not a "'materially adverse change in the terms and conditions of employment' because such actions 'must be more disruptive than a mere convenience or an alteration of job responsibilities'") (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)); *Martinez-Santiago v. Zurich N. Am. Ins. Co.*, 2010 WL 184450, at *7 (S.D.N.Y. Jan. 20, 2010) ("The denial of plaintiff's telecommuting request was a short term inconvenience that did not rise to the level of an adverse employment action."); *Smith v. AVSC Int'l, Inc.*, 148 F. Supp. 2d 302, 312-13 (S.D.N.Y. 2001) (holding that "requiring [plaintiff] to observe a variety of new working conditions, such as not allowing him to work from home . . . [did] not constitute 'adverse employment actions' as a matter of law").

discrimination based on denial of remote-work request in 2018); *Moll v. Telesector Res. Grp., Inc.*, 2020 WL 5593845, *12 (W.D.N.Y. Sept. 18, 2020) (addressing discrimination claims based in part on denial of remote work and vacation time requests in 2002 and 2003). Since the COVID-19 pandemic, district courts have diverged regarding whether denial of remote work requests for COVID-19-related reasons constitutes an adverse employment action.[4] At least two courts in the Second Circuit have found that denial of permission to work remotely may constitute an adverse employment action in a disability discrimination claim under the ADA, which uses the same standards for adverse employment actions as Title VII;[5] however, in both cases, the supporting allegations were

---

[4] *Compare Vasilenko v. City of Portland*, 2023 WL 3467232, at *7 (D. Or. Mar. 6, 2023), *report & recommendation adopted*, 2023 WL 3455639 (D. Or. May 14, 2023) (recommending denial of motion to dismiss retaliation and religious discrimination claims based on denial of remote-work request by employee opposed to local government's vaccination requirement); *Johnson v. Buttigieg*, 2022 WL 17551986, at *4 (N.D. Cal. Dec. 9, 2022) (holding plaintiff adequately pled an adverse action when, after his June 2020 telework request, "he was forced to use his accrued sick and holiday leave until it was exhausted in order to stay at home and was eventually constructively discharged because he refused to resume in-person work"); *Gordwin v. Amazon.com Inc.*, 2021 WL 5396086, at *4 (D. Ariz. Nov. 17, 2021) (finding that "having to work in person during the COVID-19 pandemic while others worked remotely" in 2020 sufficiently alleged adverse employment action for Title VII claim), *with Perry v. Impact Fam. Counseling*, 2023 WL 4477226, at *14 (N.D. Ala. July 11, 2023) (finding "no evidence or argument to support that [defendant] seriously and materially changed [plaintiff's] employment by requiring her to work from the office rather than from home"); *Strother v. Cnty. of Albemarle*, 2023 WL 4400071, at *3 (W.D. Va. July 7, 2023) ("[Plaintiff] alleges that she could not telework and would either need to resign or be terminated if she did not return to work, which does not amount to an adverse employment action."); *Matthews v. City of Tempe*, 2023 WL 2072497, at *5 (D. Ariz. Feb. 17, 2023) (declining to "find that [d]efendants' denial of [p]laintiff's requests to telecommute—on just a few occasions in January and February 2021—amounted to the sort of adverse employment action which materially affected Plaintiff's compensation, terms, conditions, or privileges of employment" where plaintiff benefited from other telework and leave policies); *Peifer v. Pennsylvania*, 2023 WL 125017, at *6 (E.D. Pa. Jan. 5, 2023) ("Yet [d]efendant's refusal to satisfy [p]laintiff's particular preference [to work from home], which was not required by the medical documentation, is not evidence of an adverse employment action, nor is it evidence of discrimination.").

[5] *See Ham v. ICL Bronx House Inst. for Cmty. Living*, 2021 WL 2651945, at *3 (S.D.N.Y. June 28, 2021) (observing that plaintiff who sought ability to work from home in March 2020 due to fears of exposing family member to COVID-19 failed to plead facts showing that "any adverse employment action, *which could include her being denied permission to work from home*[,]" was taken for discriminatory reasons) (emphasis supplied); *Coleman v. N.Y.C. Dep't of Health &*

deemed insufficient.

In the unique context of the COVID-19 pandemic, denying an employee's request to work from home was arguably not a "mere inconvenience[,]" *Tassy*, 51 F.4th at 529, particularly when other employees were allowed to do so. *Cf. Chamberlain v. Res-Care, Inc.*, 2022 WL 7127748, at *3 (M.D. Pa. Oct. 11, 2022) ("Her job conditions were arguably altered in that she was not allowed to work from home when others were."). Denying Plaintiff's remote-work request thus plausibly constituted a material change in the "conditions of [her] employment[,]" regardless of whether the express terms of her contract changed. *Kessler*, 461 F.3d at 207. At the pleading stage, drawing all reasonable inferences in her favor, Plaintiff has plausibly alleged that she experienced an adverse employment action for the purposes of her Title VII and NYSHRL claims.

### 2.     Whether Plaintiff Plausibly Alleges a Constructive Discharge.

With regard to Plaintiff's alleged constructive discharge, Defendant argues Plaintiff's voluntary resignation does not constitute an adverse employment action as a matter of law. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000) (internal quotation marks omitted). An intolerable work atmosphere exists when work conditions are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* (internal quotation marks omitted). This standard "is a demanding one," *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010), and constructive discharge claims "are routinely rejected by the courts." *Wright v. Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 325 (S.D.N.Y. 2005) (collecting cases); *see also Alfieri v. SYSCO Food Servs.-- Syracuse*, 192 F. Supp. 2d 14, 23 (W.D.N.Y. 2001) ("This burden [to establish constructive discharge] is not an easy one to carry."). "[A] constructive discharge cannot

---

*Mental Hygiene*, 2022 WL 704304, at *5 (S.D.N.Y. Mar. 9, 2022) (granting motion to dismiss where plaintiff did not sufficiently plead that defendant's "failure to allow him to work from home or to hire him for either of these two temporary positions was because of his disability").

be proven merely by evidence that an employee . . . preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993).

Plaintiff alleges that she suffered severe emotional distress when she was required to work in-person due to her fears of being exposed to COVID-19 at work and, in turn, exposing her ten-year-old son with a disability that allegedly places him at high-risk. She alleges she was exposed to at least one employee with COVID-19 and discovered that workers processing COVID-19 tests were using her desk and phone without her knowledge or permission. She also alleges that she experienced severe emotional distress and humiliation because she was forced to use all of her paid leave time and then take unpaid leave, whereas her co-workers who were at high-risk or had school-aged children were allowed to work remotely without taking leave. Her supervisors and Defendant's Human Resources staff allegedly knew of her concerns but required her to abide by her supervisor's denial of her remote work requests.

Contrary to Defendant's characterization, Plaintiff's concerns for the health and safety of herself and her son transcend mere disagreement with her employer's business decisions. The Second Circuit has recognized that "constructive discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health." *Id.* (holding that "stress-related ill health from the demands of [an employee's] voluntarily undertaken . . . performance" was not a health risk justifying constructive discharge); *see also Cabrera v. CBS Corp.*, 2018 WL 1225260, at *7 (S.D.N.Y. Feb. 26, 2018) (collecting cases holding workplace risks of harm to employees' physical condition or health sufficient to support constructive discharge claims). Since the COVID-19 pandemic, at least one district court in the Second Circuit has found that an employee plausibly stated a claim for constructive discharge where she alleged her supervisors required her to work in person even though she was at high-risk for COVID-19 complications while allowing other employees to work remotely. *See Knight v. MTA N.Y.C. Transit Auth.*, 2021 WL 10424509, at *10 (E.D.N.Y. Sept. 28, 2021). In that case, the plaintiff's supervisors also allegedly engaged

11

in retaliatory behavior in response to the plaintiff's filing of EEOC complaints and a federal lawsuit alleging discrimination. *Id.* at *11 (concluding that "the cumulative effect of multiple adverse workplace conditions" made it plausible that the plaintiff "was intentionally made to feel that she was not wanted as an employee") (internal quotation marks omitted).

Here, although a close question, Plaintiff has plausibly alleged that Defendant disregarded her and her son's health and safety by denying her requests to work remotely. She has further plausibly alleged that, after requiring her to take unpaid leave to stay home, Defendant reacted to her repeated complaints to Human Resources by barring her from continuing to take unpaid leave and requiring her to work at the office full-time. In light of Defendant's alleged awareness of the reasons for Plaintiff's requests and the alleged permission to work remotely granted to her coworkers with similar health concerns and childcare responsibilities, it is "at least plausible that [P]laintiff was intentionally made to feel that she was not wanted as an employee." *Id.*

Viewing the Complaint's allegations in the light most favorable to Plaintiff, because at least it is plausible that a reasonable person in her position would have felt compelled to resign, she plausibly alleges constructive discharge. *See Cabrera*, 2018 WL 1225260, at *7 ("A work environment that puts an employee at unreasonable risk of physical harm is sufficiently intolerable to support a claim of constructive discharge."); *see also Cadet v. Deutsche Bank Sec. Inc.*, 2013 WL 3090690, at *11 (S.D.N.Y. June 18, 2013) ("A voluntary resignation does not constitute an adverse employment action unless the plaintiff was constructively discharged—i.e., the resignation was in fact *involuntary* as a result of coercion or duress.") (emphasis in original).

### 3.   Whether Plaintiff Plausibly Alleges an Inference of Discriminatory Motive.

"[A]t the pleadings stage of an employment discrimination case, a plaintiff has a '*minimal* burden' of alleging facts 'suggesting an inference of discriminatory motivation.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)

(quoting *Littlejohn*, 795 F.3d at 310).[6] "Because discrimination claims implicate an employer's usually unstated intent and state of mind, rarely is there direct, smoking gun, evidence of discrimination." *Id.* at 86 (internal quotation marks omitted); *see also Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("[E]mployment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence.").

A plaintiff may allege an inference of discrimination "by showing that the employer subjected h[er] to disparate treatment, that is, treated h[er] less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).[7] "[T]he plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.*

---

[6] The Second Circuit has described this minimal burden as follows:

> At [the initial stage of litigation], a plaintiff seeking to defeat a defendant's motion for summary judgment would not need evidence sufficient to sustain her ultimate burden of showing discriminatory motivation, but could get by with the benefit of the presumption if she has shown evidence of the factors entitling her to the presumption.

> The discrimination complaint, by definition, occurs in the first stage of the litigation. Therefore, the complaint also benefits from the temporary presumption and must be viewed in light of the plaintiff's minimal burden to show discriminatory intent. The plaintiff cannot reasonably be required to allege more facts in the complaint than the plaintiff would need to defeat a motion for summary judgment made prior to the defendant's furnishing of a non-discriminatory justification. *Cf. Swierkiewicz*, 534 U.S. at 511-12, 122 S. Ct. 992 ("It . . . seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered.").

*Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

[7] *See also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) ("It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including . . . the more favorable treatment of employees not in the protected group[.]") (internal quotation marks omitted), *superseded by statute on other grounds*; *Colon v. City of New York*, 2021 WL 4943552, at *12 (S.D.N.Y. Jan. 15, 2021) ("The plaintiff must still identify at least one comparator to support a minimal inference of discrimination in order to survive a motion to dismiss.") (internal quotation marks omitted), *report & recommendation adopted*, 2021 WL 4427169 (S.D.N.Y. Sept. 26, 2021).

(internal quotation marks omitted). Although "there should be an objectively identifiable basis for comparability[,]" "[w]hat constitutes 'all material respects' . . . varies somewhat from case to case[.]" *Id.* at 40. This determination generally "rests on 'whether the plaintiff and those she maintains were similarly situated were subject to the same workplace standards.'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (alteration adopted) (quoting *Graham*, 230 F.3d at 40). "Ordinarily, whether two employees are similarly situated presents a question of fact, rather than a legal question to be resolved on a motion to dismiss." *Id.* (alteration and omission adopted).

Defendant argues that Plaintiff "admits that race played no part in the denial of her remote work request[,]" because she "claim[ed] 'it was up to her supervisor's discretion whether to approve or deny remote access' and that her supervisor determined 'the needs of the department' required Plaintiff to work on campus." (Doc. 7-5 at 16.) This characterization interprets Plaintiff's Complaint too narrowly. Plaintiff asserts that, notwithstanding Defendant's explanations, she was treated differently due to her race. *See* Doc. 1 at 7, ¶ 40 ("[Plaintiff], the only black employee in her department, was denied the ability to work remotely because of her race.").

Defendant's further argument that Plaintiff fails to allege that she was treated less favorably than other employees suffers from this same defect. A plaintiff need not identify a co-worker who is identically situated with the same supervisor, comparable job titles or responsibilities, and the same department in order to allege disparate treatment at the pleading stage. "[T]he standard for comparing conduct requires a *reasonably close* resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham*, 230 F.3d at 40 (emphasis supplied); *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."). Plaintiff alleges that "Caucasian" administrative assistants "with similar duties" were allowed to work from home. (Doc. 1

at 6, ¶ 32.) She also alleges that other employees in her department were permitted to work remotely, and that Defendant made accommodations for other employees with "school aged children who were doing remote on-line learning[.]" *Id.* at ¶ 30. Although Plaintiff does not identify a single identical comparator, she has identified comparators in "reasonably close" circumstances outside her protected group who were allegedly treated more favorably. *Graham*, 230 F.3d at 40.

Because "the evidence necessary to satisfy the initial burden of establishing that an adverse employment action occurred under circumstances giving rise to an inference of discrimination is minimal[,]" at the prima facie stage, Plaintiff has satisfied this burden. *Littlejohn*, 795 F.3d at 313 (internal quotation marks omitted) (quoting *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)).

For the reasons stated above, Defendant's motion to dismiss Counts I and II of the Complaint is DENIED.

### 4.    Whether Plaintiff Plausibly Alleges a Hostile Work Environment.

In Counts I and II, Plaintiff alleges that she was subjected to a racially "hostile and abusive work environment [which] was created by decisions, actions and conduct engaged in by [Defendant]" and was "fostered and promoted by [Defendant's] discriminatory acts and conduct as described [in the Complaint]" in violation of Title VII and NYSHRL. (Doc. 1 at 10, 12, ¶¶ 60, 74.) Defendant allegedly "knowingly and recklessly permitted its employees, supervisors and leadership team to treat African American employees in a manner different from the treatment received by similarly situated Caucasian employees." *Id.* at 11, ¶ 64. It also allegedly "engaged in a pattern and practice of discrimination against Plaintiff with respect to compensation, terms, conditions, and privileges of employment[.]" *Id.* at 12, ¶ 74.

To establish a hostile work environment claim under Title VII, a plaintiff "must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Raspardo v. Carlone*, 770

F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* (citing *Harris*, 510 U.S. at 21 and *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). A plaintiff must further plausibly allege that his or her employer "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000).

Generally, unless a single act is severe enough to "transform[]" the workplace, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374 (internal quotation marks omitted). To determine whether this standard has been met, courts "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Littlejohn*, 795 F.3d at 321 (quoting *Harris*, 510 U.S. at 23).

To establish a race-based hostile work environment claim under Title VII, a plaintiff must plausibly allege that the conduct occurred because of his or her race. *Alfano*, 294 F.3d at 374. A plaintiff may rely upon direct or circumstantial evidence of racial harassment to support his or her claim. *Tassy*, 51 F.4th at 533.

"While the standard for establishing a hostile work environment is high," the Second Circuit has "repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Terry*, 336 F.3d at 148 (emphasis and internal quotation marks omitted) (quoting *Whidbee*, 223 F.3d at 70). "The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases."

*Whidbee*, 223 F.3d at 70 (internal quotation marks omitted) (quoting *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997)).

Defendant argues that Plaintiff's allegations that she experienced hostile treatment are conclusory, speculative, and bereft of supporting facts. The court agrees. For example, although Plaintiff alleges that she "experienced hostility" from other employees because she worked for an African American urologist who was suing Defendant for race-based discrimination (Doc. 1 at 5, ¶ 27), she does not explain the nature of this hostility or how frequently it was expressed.

To the extent Plaintiff bases her hostile work environment claim on not being permitted to work remotely, as well as on her meeting with Mr. Scott, Plaintiff does not allege that she was subject to the kind of "discriminatory intimidation, ridicule, and insult" that may support a hostile work environment claim. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010).[8] Nor does she describe a single incident of racial hostility while claiming it was pervasive.

Although discovery may reveal a basis for Plaintiff's hostile work environment claim, at this juncture, she fails to allege conduct that is so severe and pervasive that it transformed her workplace. *Alfano*, 294 F.3d at 374. "In short, plaintiff's hostile work environment claim is based on little more than her use of that term itself. That is not enough to state a facially valid cause of action." *McCullough v. Xerox Corp.*, 942 F. Supp. 2d 380, 386 (W.D.N.Y. 2013).

Because Plaintiff fails to plausibly allege a hostile work environment claim under

---

[8] *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002) (holding plaintiff could base his hostile work environment claim on "evidence from a number of other employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets"); *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 390 (2d Cir. 2020) (finding plaintiff who presented evidence of discriminatory and offensive comments made in his presence raised disputed issue of material fact regarding hostile work environment claim); *E.E.O.C. v. 98 Starr Road Operating Co.*, 2023 WL 4557751, at *8 (D. Vt. July 17, 2023) (holding race-based hostile work environment claim plausibly alleged based on "repeated incidents of racial insults, physical assaults, and threats of deadly force" by nursing home residents).

Title VII and the NYSHRL, Defendant's motion to dismiss Plaintiff's hostile work environment claims set forth in Counts I and II is GRANTED.

### C.     Whether Plaintiff States a Claim Under 42 U.S.C. § 1981.

Defendant asks the court to dismiss Plaintiff's § 1981 claim because it is entitled to sovereign immunity as a public benefit corporation. In the alternative, it argues it is entitled to dismissal because discrimination claims under § 1981 are analyzed under the same standards as claims brought under Title VII and Plaintiff fails to state a claim for race-based discrimination. [9]

The Second Circuit has held that § 1981 does not provide a private right of action against state actors, including municipalities. *See Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018) ("We . . . join nine of our sister Circuits in concluding that § 1981 does not provide a separate private right of action against state actors."). In addition, it has found Westchester County Health Care Corporation, a public hospital corporation created under the New York Public Authorities Law, to be a municipality for § 1981 purposes. *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 477 (2d Cir. 2009); *see also Gachette v. Metro-North Commuter R.R. Co.*, 804 F. App'x 65, 66-67 (2d Cir. 2020) (holding that as a public benefit corporation, defendant was a New York state actor); *Lewis v. Roosevelt Island Operating Corp.*, 246 F. Supp. 3d 979, 988 (S.D.N.Y. 2017) (finding public benefit corporation was "an arm of the state subject to sovereign immunity" and thus plaintiff's § 1981 claim for race-based discrimination could not survive). In light of Second Circuit precedent, this court has previously considered Defendant's liability under § 1981 and concluded that as "a public hospital created under the New York Public Authorities Law, Roswell Park is entitled to the same status . . . as a municipality with respect to section 1981." *Zhou v. Roswell Park Cancer Inst. Corp.*, 2021 WL 4272286, at *4 (W.D.N.Y. Sept. 21, 2021) (omission in original).

---

[9] *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause[.]").

Plaintiff argues that at least one court has declined to decide whether Defendant was a state actor for the purposes of punitive damages until it had the benefit of a fully developed record and urges this court to do the same. *See Underwood v. Roswell Park Cancer Inst.*, 2017 WL 1593445, at *6 (W.D.N.Y. May 2, 2017) (withholding judgment as to "whether Roswell Park is a state actor for the purpose of punitive damages" because it would likely be "a fact-intensive inquiry"). The question of punitive damages, however, is separate from the issue of whether Plaintiff may allege a claim against Defendant under § 1981. Defendant is clearly entitled to sovereign immunity under controlling precedent. Plaintiff cites no authority to the contrary.

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's § 1981 claim (Count III) is GRANTED.

**D.     Whether Plaintiff States a Claim Under 42 U.S.C. § 1983.**

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Although municipalities are considered state actors that cannot be sued under § 1981, they are not "arms of the state" entitled to sovereign immunity on § 1983 claims. *See Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) ("Sovereign immunity does not, however, extend to local governments or municipalities.").

To maintain a § 1983 action against a municipality, a plaintiff must "show that the challenged acts were performed pursuant to a municipal policy or custom[.]" *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978)). A plaintiff may establish a policy or custom in four ways:

> (1) a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers; (2) conduct ordered by a municipal official with policymaking authority; (3) actions taken pursuant to governmental custom even though such a custom has not received formal

> approval through the body's official decision making channels; or (4) a
> failure to train municipal employees that amounts to deliberate indifference
> to the rights of persons with whom the employees come into contact.

*Lewis v. Cuomo*, 2021 WL 5827274, at *16 (W.D.N.Y. Dec. 8, 2021) (alteration adopted)
(internal quotation marks omitted).

Plaintiff alleges that Defendant violated the Equal Protection Clause by
discriminating against her on the basis of her race. Defendant argues that Plaintiff's
§ 1983 claim must be dismissed because she does not allege a policy or custom and her
failure to respond to Defendant's arguments constitutes abandonment of her claim.
Plaintiff responds that Defendant "cannot establish that it is immune from liability under
42 U.S.C. § 1983 by reaching the self-serving conclusion that the adverse actions that
resulted in [Plaintiff's] losing benefits and being constructively discharged were not the
result of a policy or custom" (Doc. 14 at 27), but she fails to acknowledge it is her burden
in the first instance to plausibly assert a *Monell* claim.[10]

Similarly, she does not allege the challenged conduct was authorized by an
"official [with] final policymaking power[,]" or that "the challenged actions [were]
within that official's area of policymaking authority." *Roe v. City of Waterbury*, 542 F.3d
31, 37 (2d Cir. 2008) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988)).
"An official has final authority if his decisions, at the time they are made, 'may fairly be
said to represent official policy.'" *Id.* (quoting *McMillian v. Monroe Cnty., Alabama*, 520
U.S. 781, 784 (1997)). Whether an official has final policymaking authority is a question
of state law. *See Praprotnik*, 485 U.S. at 126 (finding Mayor, Alderman, and
Commission were final policymakers if their decisions were not reviewable because their
decisions would be "attributable to the city itself").

---

[10] For example, Plaintiff does not allege that Ms. Czamara's refusal to permit her to work from
home or Defendant's failure to investigate her complaints to Human Resources were pursuant to
a discriminatory custom or policy. She also does not contend this conduct resulted from
Defendant's failure to train its employees. *See Curkin v. City of New York*, 2020 WL 5628042, at
*11 (S.D.N.Y. Sept. 21, 2020) (noting that although "a failure to investigate is not cognizable as
a freestanding claim under § 1983, it may still be considered as part of a *Monell* claim") (citation
omitted).

Although Plaintiff alleges that Ms. Czamara was her supervisor and that Human Resources told her that her supervisor had discretion to determine whether she could work remotely, she does not allege that Ms. Czamara's decision was unreviewable or represented Defendant's official policy. To the contrary, she alleges that each department supervisor set his or her own policy and that, within her Department, the policy varied based upon her supervisor's discretion. She also does not allege that Mr. Scott, as the Director of Diversity and Inclusion, had final policymaking power over the denial of her remote work request.

Even after drawing all reasonable inferences in Plaintiff's favor, Plaintiff nonetheless fails to state a plausible § 1983 claim against Defendant under *Monell*. Defendant's motion to dismiss that claim (Count IV) is therefore GRANTED.[11]

### E.   Whether Plaintiff States a Claim for Disability Discrimination Under the ADA.

Plaintiff alleges that Defendant created a hostile working environment and "limited, segregated, and/or classified Plaintiff in a way that adversely affected her opportunities or status because of her association and/or relationship with her disabled son" in violation of the ADA. (Doc. 1 at 15, ¶¶ 99-100.) The Complaint contains no explanation of Plaintiff's son's disability and does not assert it constitutes "a physical or mental impairment that substantially limits one or more [of his] major life activities[.]" 42 U.S.C. § 12102(1)(A).

Defendant points to the *Technical Assistance Questions & Answers* about COVID-19 and the ADA,[12] which states: "The ADA does not require that an employer

---

[11] For this reason, the court need not decide whether Plaintiff has abandoned her claim through inadequate briefing. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) ("[G]enerally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others, and a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.") (internal quotation marks omitted).

[12] Defendant asks the court to take judicial notice of this page on the EEOC's website. A court may "take judicial notice of documents retrieved from official government websites or other government records from such websites." *Leger v. Kalitta*, 2018 WL 2057142, at *3 (E.D.N.Y.

accommodate an employee without a disability based on the disability-related needs of a family member or other person with whom the employee is associated."[13] Plaintiff asserts that Defendant "misconstrues" this guidance but does not explain how. (Doc. 14 at 28.) Defendant, in turn, cites no authority that the EEOC's guidance binds this court.

"The ADA prohibits, *inter alia*, 'excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.'" *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016) (quoting 42 U.S.C. § 12112(b)(4)).

> [T]o sustain an "associational discrimination" claim under the ADA, a plaintiff must first make out a prima facie case by establishing: 1) that she was qualified for the job at the time of an adverse employment action; 2) that she was subjected to adverse employment action; 3) that she was known at the time to have a relative or associate with a disability; and 4) that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

*Id.* "Though the ADA does not require an employer to *provide* a reasonable accommodation to the nondisabled associate of a disabled person, an employer's *reaction* to such a request for accommodation can support an inference that a subsequent adverse employment action was motivated by associational discrimination." *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 469 (2d Cir. 2019) (emphasis in original). "One scenario that may support an inference that the adverse employment decision was motivated by associational discrimination is 'distraction': the employer's 'fear that the employee will be inattentive at work due to the disability of the disabled person.'" *Id.* at 468 (alteration adopted) (internal quotation marks omitted). Plaintiff contends that she was denied the same benefits and opportunities as her co-workers because Defendant was concerned that

---

Jan. 26, 2018). Because the website is an official government website and because Plaintiff has not objected, the court takes judicial notice of it pursuant to Fed. R. Evid. 201.

[13] EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws (last updated July 12, 2022).

she would be distracted by her disabled son and unable to answer phone calls and complete her other work responsibilities from home.

With regard to the first prong, Plaintiff plausibly alleges that she was "able to perform the essential functions of her job with or without a reasonable accommodation." Doc. 1 at 15, ¶ 98; *see also Kelleher*, 939 F.3d at 469 ("An employee is qualified if [s]he 'can perform the essential functions of the employment position.'") (quoting 42 U.S.C. § 12111(8)). As to the second prong, although a close question, denial of an employee's request to work remotely during the COVID-19 pandemic could be considered an adverse employment action. *See Ham v. ICL Bronx House Inst. for Cmty. Living*, 2021 WL 2651945, at *3 (S.D.N.Y. June 28, 2021) (noting that an adverse employment action "could include her being denied permission to work from home[,]" in an ADA claim brought by a plaintiff who sought to work from home in March 2020 due to fears of exposing family member to COVID-19); *cf. Coleman v. N.Y.C. Dep't of Health & Mental Hygiene*, 2022 WL 704304, at *5 (S.D.N.Y. Mar. 9, 2022) (holding plaintiff failed to plausibly plead an ADA claim based in part on allegation that defendant's "failure to allow him to work from home . . . "was because of his disability").

Although Plaintiff alleges that she informed Ms. Czamara that her desire to work remotely was due to her need to "care for her disabled 10-year-old son who was high-risk, due to his disability, and whose school had moved to remote on-line instruction[,]" this allegation fails to satisfy the third prong of her associational disability claim because she alleges no specifics as to whether the information she provided to Ms. Czamara was sufficient to allege a "disability." (Doc. 1 at 6, ¶ 31.) She does not claim she asked for Family and Medical Leave Act ("FMLA") leave or proposed remote work as a reasonable accommodation.

With regard to the final prong, Plaintiff alleges only that Ms. Czamara stated that her request was denied due to "the needs of the department" and because she was "not comfortable with Plaintiff working and answering calls from home." (Doc. 1 at 6, ¶¶ 34-35.) Although Plaintiff's burden at the prima facie stage is minimal, accepted as true, these allegations are insufficient to support a reasonable inference that the denial of

remote work was because Defendant was concerned that Plaintiff's responsibilities for her son would distract her and prevent her from performing her job adequately. *Compare Kelleher*, 939 F.3d at 470 (finding inference of distraction established where plaintiff was told "his problems at home were not the company's problems" and "he was effectively demoted after he missed a day's work to care for his daughter [with a disability]"), *with Graziadio*, 817 F.3d at 432 (finding no inference of discrimination where plaintiff was terminated for taking too much leave from work to care for her son as opposed to doing her job inadequately).

Because Plaintiff does not plausibly plead her associational disability discrimination claim, Defendant's motion to dismiss Plaintiff's ADA claim based on associational discrimination (Count V) is GRANTED.

### F.    Whether Plaintiff Plausibly Pleads Retaliation.

Defendant argues that to the extent Plaintiff alleges retaliation, that claim relates to Defendant's failure to investigate and must be dismissed. Plaintiff counters that her claim for retaliation relates instead to Ms. Czamara's decision to order her to return to work after Plaintiff made repeated complaints to Human Resources.

"[F]or a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him [or her], (2) 'because' he [or she] has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90. "Affirmative efforts to punish a complaining employee are at the heart of any retaliation claim." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (internal marks omitted). For the purposes of a Title VII retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). The Supreme Court has explained:

> Context matters. The real social impact of workplace behavior often
> depends on a constellation of surrounding circumstances, expectations, and

relationships which are not fully captured by a simple recitation of the
words used or the physical acts performed. A schedule change in an
employee's work schedule may make little difference to many workers, but
may matter enormously to a young mother with school-age children. A
supervisor's refusal to invite an employee to lunch is normally trivial, a
nonactionable petty slight. But to retaliate by excluding an employee from a
weekly training lunch that contributes significantly to the employee's
professional advancement might well deter a reasonable employee from
complaining about discrimination.

*Burlington N. & Santa Fe. Ry. Co.*, 548 U.S. at 69.

Denial of a request to work remotely during a pandemic may constitute an adverse
employment action for the purposes of a retaliation claim.[14] Requiring a mother with a
school-age son to return to work full-time is a schedule change that plausibly could
"matter enormously[,]" *id.* at 69, and could plausibly dissuade a reasonable worker from
making a charge of discrimination. *See Washington v. Ill. Dep't of Revenue*, 420 F.3d
658, 662 (7th Cir. 2005) (holding rescission of flex-time schedule for mother with
disabled child was a "materially adverse change" for purpose of retaliation claim).

With regard to causation, "[a] retaliatory purpose can be shown indirectly by
timing: protected activity followed closely in time by adverse employment action." *Vega*,
801 F.3d at 90. Plaintiff alleges that Ms. Czamara's order to return to work full-time
occurred within a month of Plaintiff's complaints to Human Resources regarding an
"unlawful employment practice." *Id.* At the motion to dismiss stage, this temporal
proximity raises an inference of causation sufficient to plead a plausible claim for

---

[14] *See, e.g., Kimoto v. Nature's Sunshine Prod.*, 2023 WL 3872008, at *4 (D. Utah June 7, 2023)
(finding adverse action for FMLA claim when plaintiff was "denied the opportunity to work
remotely without explanation, despite being able to do so prior to her FMLA leave and when
other employees (who did not request FMLA leave) were allowed the opportunity");
*Chamberlain v. Res-Care, Inc.*, 2022 WL 7127748, at *5 (M.D. Pa. Oct. 11, 2022) (recognizing
that "refusal to allow [plaintiff] to work from home . . . [was] the earliest cognizable adverse
employment action raised in the Complaint"); *Brownlow v. Alfa Vision Ins. Co.*, 527 F. Supp. 3d
951, 960 (M.D. Tenn. 2021) ("The Court also finds that [plaintiff] suffered an adverse
employment action when [plaintiff] refused to keep his position open, and he may have suffered
additional adverse employment actions when [defendant] rescinded his accommodation to work
from home and required him to take and exhaust FMLA leave.").

retaliation. *See id.* at 92 (holding complaint "plausibly allege[d] a temporal proximity" for adverse actions taken two to three months after each of the plaintiff's protected activities); *see also Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) ("This temporal proximity [of four months elapsing between events] is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion.").

For the reasons stated above, Defendant's motion to dismiss Plaintiff's retaliation claim is DENIED.

### G.    Whether Plaintiff May Seek Punitive Damages.

Defendant seeks dismissal of Plaintiff's claim for punitive damages. Although punitive damages are intended to "punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct[,]" *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266-67 (1981) (citations omitted), "an award of punitive damages against a municipality 'punishes' only the taxpayers, who took no part in the commission of the tort." *Id.* at 267. "For that reason, municipalities are generally immune from punitive damages." *Zhou*, 2021 WL 4272286, at *4.

A "particularized inquiry" is generally "necessary to determine whether . . . the public benefit corporation should be treated like the State [or a municipality]" for the purposes of immunity from punitive damages. *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 192 (N.Y. 1987). Whether the corporation serves "an essential public function" and the "public source of much of its funding" are considerations that inform this inquiry. *Id.* (holding Metropolitan Transit Authority was immune from punitive damages due to the essential function it served "in providing commuter transportation" and its public funding).

Plaintiff alleges that "[b]ecause New York is not responsible for judgments against Roswell Park, if punitive damages are awarded in this action, innocent taxpayers would not bear the costs." (Doc. 1 at 4-5, ¶ 21.) Defendant counters it is entitled to dismissal of Plaintiff's claims for punitive damages on the grounds that it is a public benefit corporation, but it does not address "how an award of punitive damages against Roswell

Park would be paid and its impact on the public fisc." *Zhou*, 2021 WL 4272286, at *5. New York law created the Roswell Park Corporation "for a public purpose" and provides that "the exercise by such corporation of its functions, powers and duties constitutes the performance of an essential public and governmental function." N.Y. Pub. Auth. Law § 3551(8). Defendant also receives state and federal subsidies and grants.[15]

Two courts in this district have concluded that "determining whether Roswell Park [was] a state actor for the purpose of punitive damages w[ould] be a fact-intensive inquiry[.]" *Zhou*, 2021 WL 4272286, at *4. As a result, they "declined to resolve that issue at the pleading stage, instead waiting until 'a later stage in the litigation with the benefit of a fully developed record' to resolve it." *Id.* (quoting *Underwood*, 2017 WL 1593445, at *6). This court would similarly benefit from a more developed factual record. Defendant's motion to dismiss Plaintiff's punitive damages request is therefore DENIED WITHOUT PREJUDICE.

---

[15] "[A] court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination[.]" *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020). Accordingly, the court takes judicial notice of Roswell Park Comprehensive Cancer Center Section 203 Budget Filing Fiscal Year 2022 - 2023 FINAL, https://www.roswellpark.org/sites/default/files/2022-03/fy23-section-203-budget-filing.pdf.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Doc. 7) is GRANTED
IN PART and DENIED IN PART. Counts I and II of Plaintiff's Complaint are
DISMISSED to the extent they allege hostile work environment claims. Counts III, IV,
and V are DISMISSED except insofar as Count IV asserts a retaliation claim. Plaintiff
has not sought leave to amend and the court declines to grant leave *sua sponte*. *See
Horoshko v. Citibank, N.A.*, 373 F.3d 248, 250 (2d Cir. 2004) (noting a district court does
not "abuse[] its discretion in not permitting an amendment that was never requested").
SO ORDERED.

Dated this 28th day of September, 2023.

Christina Reiss, District Judge
United States District Court