UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

MARSHA GAYLES,
)
)
Plaintiff,
)
)
v.
)
)
Case No. 1:22-cv-00750
)
ROSWELL PARK CANCER INSTITUTE
)
CORPORATION d/b/a/ ROSWELL PARK
)
CANCER INSTITUTE,
)
)
)
Defendant.
)

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND TO PRECLUDE PLAINTIFF'S EXPERT**
(Doc. 37)

Plaintiff Marsha Gayles ("Plaintiff") brings this action against Defendant Roswell Park Cancer Institute Corporation, d/b/a Roswell Park Cancer Institute ("Defendant"), alleging causes of action for race-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Count I), the New York State Human Rights Law ("NYSHRL"), Executive Law § 290 (Count II), and 42 U.S.C. §§ 1981 and 1983 (Counts III and IV), as well as disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12201 (Count V), and the NYSHRL, Executive Law § 290 (Count VI).

On January 19, 2023, Plaintiff withdrew her claim for disability discrimination in violation of the NYSHRL. *See* Doc. 14 at 7 n.1. On September 28, 2023, the court dismissed her race-based discrimination claims under Title VII and the NYSHRL to the extent she alleged a hostile work environment, her race-based discrimination claim under § 1981, and her disability discrimination claim under the ADA. (Doc. 17.) The court also dismissed Plaintiff's race-based discrimination claim under 42 U.S.C. § 1983, except insofar as it asserted a retaliation claim.

Pending before the court is Defendant's October 14, 2025 motion for summary

judgment seeking dismissal of Plaintiff's remaining claims and preclusion of Plaintiff's expert. (Doc. 37.) Plaintiff opposed the motion on November 26, 2025, (Doc. 40), and Defendant filed its reply on December 19, 2025, (Doc. 41), at which time the court took the pending motion under advisement.

Plaintiff is represented by Kevin P. Wicka, Esq. Defendant is represented by Amanda L. Lowe, Esq., and Emma Patricia Murphy, Esq.

## I.    Defendant's Motion to Preclude Plaintiff's Expert.

Pursuant to the court's grant of Plaintiff's third motion to amend the Revised Case Management Order, all expert depositions were to be completed no later than September 6, 2025. (Doc. 32-1 and 33.) In a July 31, 2025 email, Plaintiff's attorney wrote that "[e]nclosed for service upon you is Plaintiff's Expert Disclosure of Frederick G. Floss, Ph.D[.]" (Doc. 37-13 at 2.) Accompanying the email was a disclosure document that stated:

> PLEASE TAKE NOTICE that, pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiff, MARSHA GAYLES, identifies the following expert:
>
> 1.    Identity:    Fred[e]rick G. Floss, Ph.[]D., Chair, Department of Economics & Finance, SUNY Buffalo State University, 1300 Elmwood[] Avenue, Buffalo, New York 14222.
>
> 2.    Qualifications:    Fred[e]rick G. Floss, Ph.[]D., is a professor of Economics & Finance. A complete copy of Dr. Floss'[s] curriculum vitae is attached hereto as **Exhibit A**.
>
> 3.    Substance of Facts/[]Opinions: If called as an expert witness at trial[,] it is expected that Dr. Floss'[s] testimony regarding the economic losses sustained by Plaintiff []will be consistent with those opinions expressed in his report[,] which shall be sent under separate cover.

*Id.* at 3 (emphasis in original). Dr. Floss's nine-page curriculum vitae followed. No report was attached to the email or forthcoming thereafter.

Rule 26(a)(2) requires that the identity of expert witnesses be disclosed and that such disclosure:

> must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide

2

expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

Fed. R. Civ. P. 37 sets forth the sanctions a court may impose in response to a party's failure to comply with its discovery obligations under Rule 26. It provides that:

[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was *substantially justified or is harmless*.

Fed. R. Civ. P. 37(c)(1) (emphasis supplied).

"Substantial justification means 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.'" [*Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002)] (quoting *Henrietta D. v. Giuliani*, No. 95 Civ. 0641, 2001 WL 1602114, [at] *5 (E.D.N.Y. Dec. 11, 2001)). "The test of substantial justification is satisfied 'if there exists a genuine dispute concerning compliance.'" *Henrietta D.*, 2001 WL 1602114, at *5 (quoting Fed. R. Civ. P. 37(c)(1)). The burden of proving substantial justification rests with the party which has failed to disclose information. *See Am. Stock Exch. LLC*, 215 F.R.D. at 93 (citing *Wright v. Aargo Sec. Servs., Inc.*, No. 99 Civ. 9115, 2001 WL 1035139, [at] *2 (S.D.N.Y. Sept. 7, 2001)).

*Mancucci v. Paterniani*, 2025 WL 295029, at *10 (N.D.N.Y. Jan. 24, 2025).

Defendant seeks to preclude Dr. Floss because Plaintiff has, to date, failed to provide an expert witness report from Dr. Floss and has thereby failed to disclose a

3

complete statement of his opinions, the facts or data considered in forming his opinion, or any exhibits he used. Defendant's motion is unopposed. Plaintiff has offered no justification, let alone substantial justification, for her failure to disclose an expert witness report for Dr. Floss that complies with Rule 26(a)(2)(B). Accordingly, the court GRANTS Defendant's unopposed motion to preclude Dr. Floss. *See* Fed. R. Civ. P. 37(c)(1); *see also Arnold v. Krause, Inc.*, 233 F.R.D. 126, 131 (W.D.N.Y. 2005) (affirming the magistrate judge's order precluding plaintiff's expert for failure to comply with the disclosure deadlines in the second amended scheduling order).

## II.     Defendant's Motion for Summary Judgment.

### A.     Whether to Consider Plaintiff's Declaration.

Pursuant to Western District of New York Local Rule 56, a party opposing summary judgment

> shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs. Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by correspondingly numbered paragraphs in such opposing statement with citation to admissible evidence or to evidence that can be presented in admissible form at trial as required by Fed. R. Civ. P. 56(c)(1)(A).

W.D.N.Y. Loc. R. Civ. P. 56(a)(2) (emphasis omitted).

In response to Defendant's Statement of Undisputed Material Facts ("SUMF"), Plaintiff submitted a Counterstatement of Material Facts ("CSMF") including 157 paragraphs, 279 additional facts, and over a thousand pages of exhibits supported in part by Plaintiff's thirty-one-page declaration dated November 26, 2025. (Doc. 40-1.) Defendant argues that the court should disregard Plaintiff's declaration because it is comprised of self-serving statements, contradicts prior sworn testimony, is not adequately signed, and provides information omitted during Plaintiff's deposition.

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Declarations that are not based on personal knowledge or that contain inadmissible

hearsay or conclusory statements do not "create a genuine issue for trial." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).

"[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony[,]" *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) (citations omitted), and a court may disregard information in an affidavit "that had been conspicuously omitted during repeated questioning in a deposition." *Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 46 (2d Cir. 2005); *see also Perma Rsch. & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his [or her] own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

In determining whether summary judgment should be granted, the court will disregard Plaintiff's November 26, 2025 declaration to the extent it contains unsupported, conclusory statements or contradicts her previous testimony. The court will not disregard the affidavit solely due to Plaintiff's failure to sign it beyond a "/s/[.]" (Doc. 40-1 at 31.)

**B.     The Undisputed Facts.**

**1.     Plaintiff's Employment with Defendant.**

Plaintiff is an African-American female who began working for Defendant on October 26, 2017. From October 2017 to July 2018, she worked as an Executive Secretary for Dr. Willie Underwood, III, in the Department of Urology. At the time of her hiring, Dr. Underwood, who is African-American, had a pending lawsuit in this court against Defendant, alleging employment discrimination based on his race.

In or around July 2018, Plaintiff and Dr. Underwood transferred to the Cell Stress Biology Department. By early 2019, Dr. Underwood was no longer employed by Defendant. In May 2019, Plaintiff became the Executive Secretary for the Case Management Department, overseen by Patricia Czamara, who was the department's Director.

### 2.    Case Management Department.

The Case Management Department is a patient-facing department responsible for the coordination of patient care. It provides discharge planning, including placing patients in assisted living facilities, nursing homes, or medical rehabilitation units. It interfaces with insurance companies for utilization reviews whereby an insurance company approves or disapproves the level of care a patient is receiving. It also handles appeals and challenges to insurance denials.

Between May 2019 and June 2020, the Case Management Department employed one Executive Secretary, two placement coordinators, and approximately thirteen registered case managers. Throughout that period, Plaintiff was the only individual to hold the position of Executive Secretary in the Case Management Department.

The Executive Secretary's responsibilities included "answering the phone and routing calls, collecting and disseminating mail, entering discharge reports into the department's system, distributing daily assignments for case managers [including floor assignments], [] sending calendar meetings[,]" and "fielding and disbursing items from the department's pneumatic tube system[.]" (Doc. 37-18 at 3, ¶ 11-12.) Prescriptions and orders sent through the pneumatic tube were not sent electronically. Case managers used the pneumatic tube system as well.

The "Executive Secretary was also responsible for sending and retrieving faxes for the department, including physically faxing . . . charts that were provided to her[]" and "mailing hard copies of . . . patient records via certified mail." *Id.* at 4, ¶¶ 16, 18. Faxes were handled manually in the Case Management Department, but other departments handled them electronically and through email. Case managers worked on the hospital floors, and at least one communicated with the Executive Secretary by email and phone.

### 3.    Social Work Department.

The Social Work Department provided support services to patients in both inpatient and outpatient settings, including "psychosocial assessments, counseling, [] intervention for patients, . . . transportation [assistance,] and language assistance for those patients who were not English speaking or who needed an interpreter or other language

support services." (Doc. 40-3 at 8, ¶ 42.) The Case Management Department and the Social Work Department worked collaboratively and met "to discuss patients, status, and care needs[.]" *Id.* at 9, ¶ 46. They communicated by email, faxes, and in person.

When Plaintiff began working in the Case Management Department, "the Social Work Department employed an Executive Secretary named Dena Hewett, along with approximately [thirteen] to [fifteen] Social Workers." (Doc. 40-3 at 10, ¶ 51.) Beginning in the summer of 2018, Ms. Czamara also oversaw the Social Work Department and continued to do so until October 2019, when a new Director was hired.

### 4.    Onset of the COVID-19 Pandemic and Defendant's Telecommuting Policies.

In March 2020, during the COVID-19 pandemic, some departments began offering certain employees the ability to work remotely, with each department responsible for making its own determinations. On March 14, 2020, Defendant issued a Standard Operating Procedure titled "'Code White' Telecommuting Policy[.]" (Doc. 40-15 at 2.) It included a general statement of the policy, which specified:

> This policy defines the guidelines for participation in the Telecommuting program during a "Code White." Telecommuting provides for the accomplishment of work at a location (e.g. home) other than the Roswell Park Comprehensive Cancer Center (Roswell Park) campus or its satellite locations through telecommunications technology such as a computer with a broadband connection and accessing the Roswell Park network through the issuance of remote access.

*Id.*

The Code White Telecommuting Policy instructed supervisors requesting telecommuting privileges for their employees to "be prepared to answer the following criteria:"

1. Identify if the employee already has remote access;
2. Advise if the employee has a Roswell Park issued laptop; and whether it is in the employee's possession;
3. Is the laptop sufficient for the employee to do their job or does the employee require any other equipment or resources;
4. Is email and the Office 365 suite all the employee needs access to?

5. What applications and/or systems are required to perform work remotely?

6. If the employee does not have a Roswell Park issued laptop, does the employee have a personal desktop computer or laptop that can be used to access the network;

7. What approximate dates the employee is expected to be working remotely (start and end date);

8. What is the impact of the employee not being able to work remotely;

9. Outline how productivity will be measured and the supervisor's plan for such.

*Id.* Defendant issued a second Standard Operating Procedure on March 14, 2020, revised on March 17, 2020, titled "Emergency Telecommuting Policy" which stated:

> This policy defines the guidelines for participation in the Telecommuting program during an emergency. Telecommuting provides for the accomplishment of work at a location (e.g. home) other than the Roswell Park Comprehensive Cancer Center (Roswell Park) campus or its satellite locations through telecommunications technology such as a computer with a broadband connection and accessing the Roswell Park network through the issuance of remote access.

(Doc. 40-16 at 2.) It included the same criteria for supervisors requesting telecommuting privileges as the "Code White" Telecommuting Policy.

Errol Douglas, Senior Vice President of Human Resources ("HR") for Defendant, observed that remote work was viewed as both a "privilege" and a "necessity" during the COVID-19 pandemic, depending on the stage of the pandemic. (Doc. 40-7 at 86:8.) He noted, however, that it was "[i]n some ways" always a privilege "because [Defendant is] a cancer hospital, so [Defendant has] to have people on[-]site." *Id.* at 85:23-86:2.

### 5.  Defendant's COVID-19 Productivity Plan.

On April 29, 2020, Defendant issued the "Productivity Plan [D]uring COVID-19 Pandemic" Policy and Procedure. (Doc. 40-24 at 2.) It "provide[d] requirements for the creation of [a] specific departmental Productivity Plan that ensures a safe, coordinated, sustainable, and efficient environment[]" and was to "be administered by Roswell Park managers through the directive of the ICS [(Incident Command System)]." *Id.* It further provided that:

8

Pursuant to New York State Executive Orders and Guidance, Roswell Park Cancer Institute, Health Research Incorporated and Roswell Park Alliance Foundation are deemed to be Essential Businesses. Therefore, only those Associates (employees, volunteers, students, contractors[,] or vendors) that are needed to provide products and services that are essential to the business, operations and mission of these Essential Businesses are permitted to physically work on-site. For any Associates that are able to efficiently and effectively perform the essential functions of their job from home, the Essential Businesses shall utilize telecommuting procedures to the maximum extent possible in order to minimize the potential spread of COVID-19 and ensure the health and safety of the workforce.

Managers shall complete their Productivity Plan and submit it to their Chief/Senior Vice President/Vice President at least three business days prior to their planned implementation date to allow ample time and opportunity for review. If the plan is acceptable to the Chief/Senior Vice President/Vice President, then he or she shall submit and present the plan to the ICS at least two business days prior to the planned implementation date.

*Id.* at 2-3. Among other directives, the policy advised that:

Any employees currently telecommuting/working from home that are not required to be on-[]site to fulfill their work assignments shall continue such practice until otherwise directed. If some employees must be on[-]site for a portion of their day/shift, they shall be present on campus for the least amount of time possible[] and shall continue telecommuting for the balance of their day/shift.

*Id.* at 3-4. It required that "[a] case-by-case approach [] be taken with employee requests for alternative work schedules or accommodations due to childcare or eldercare issues." *Id.* at 4. At the time of her deposition, Ms. Czamara could not recall whether she created a Productivity Plan for the Case Management Department as required by the policy.

### 6.    Plaintiff's Requests to Work Remotely.

At the onset of the COVID-19 pandemic, Plaintiff "was very concerned about her son's disability because he was immune-compromised and particularly vulnerable to viruses related to his pulmonary system[,]" (Doc. 40-3 at 11, ¶ 61), and because her son's school had moved to remote online instruction. On or about March 16, 2020, Plaintiff asked Ms. Czamara if she could work remotely to support her son's medical and educational needs. Ms. Czamara told Plaintiff she would "give it some thought." *Id.* at

9

13, ¶ 72 (internal quotation marks omitted). Plaintiff followed up a week later, and Ms. Czamara informed Plaintiff she was still considering the request.

On or around March 24, 2020, Plaintiff learned that Ms. Hewett was working remotely, and Plaintiff covered some of her duties. Ms. Hewett returned to campus in May 2020.

On March 24, 2020, at Ms. Czamara's direction, Plaintiff coordinated procuring laptops to accommodate remote access for the Case Management Department, requesting information from her colleagues to complete the request. *See* Doc. 40-21 at 2. On March 27, 2020, Plaintiff sent the Case Management Department an update noting the status of remote access for everyone in the department. Plaintiff's status was "Pending IT approval[.]" (Doc. 40-29 at 2.) On April 2, 2020, Plaintiff picked up a laptop issued to her by Defendant's Information Technology ("IT") Department.

On April 2, 2020, Ms. Czamara informed Plaintiff that she would not be able to work remotely. Although Ms. Czamara denied Plaintiff's request to work remotely, she approved two "Caucasian" case managers, Jennifer Kruszka and Erin Mulzac, to work remotely on a rotating basis to perform utilization review. (Doc. 40 at 23.) Ms. Kruszka and Ms. Mulzac, like Plaintiff, had school-aged children. By the end of April 2020, they were asked to return to campus and did so.

Plaintiff renewed her request to work remotely in early April 2020, which Ms. Czamara again denied. Ms. Czamara discussed potential options with Plaintiff, including transferring to another department;[1] using accrued paid time off; modifying her work schedule, such as working fewer hours per week; and taking a leave of absence. Ms. Czamara attests that she also "contacted [HR] to see what [she] could do to support Plaintiff[] and [] provided her with information about childcare options for employees."

---

[1] There is no evidence that Ms. Czamara suggested Plaintiff find another job with another employer. Plaintiff's declaration, to the extent she claims this, is unsupported by her own disposition testimony, inconsistent with Ms. Czamara's deposition testimony, and therefore disregarded. *See, e.g.*, Doc. 40-8 at 135:11-14, 137:11-12 (Ms. Czamara testifying that she had suggested Plaintiff "explor[e] other options within Roswell that had different work hours" as "an option to help [Plaintiff] deal with what was going on in her life[]").

(Doc. 37-15 at 4, ¶ 19.) This was not the first time Ms. Czamara discussed adjustments to Plaintiff's work arrangement. Prior to the COVID-19 pandemic, she had discussed with Plaintiff other positions within Defendant that better aligned with the demands of her family, which included dropping off and picking up her son from school. According to Plaintiff, these proposals "ma[de] [her] feel unwanted and that [Ms. Czamara and Defendant] didn't want [her] to work there." (Doc. 40-1 at 21, ¶ 107.)

Ms. Czamara testified that, in making determinations regarding remote work for the Case Management Department employees, she considered "the duties and responsibilities of the different people in the department to determine the feasibility of working remotely and still meeting the needs of [the] patient population and the requirement[s] of the department." (Doc. 40-8 at 83:8-12.) She did "[n]ot specifically" go through the criteria listed in Defendant's Code White Telecommuting Policy or Emergency Telecommuting Policy when making her remote work determinations. *Id.* at 105:10.[2] Rather, she considered whether certain of Plaintiff's job responsibilities could be performed remotely, including "sending and receiving faxes from internal and external sources, fielding and disbursing items from the department's pneumatic tube system, routing mail and disbursing it to the appropriate person within the department, and sending hard copies of patient records to payors." (Doc. 37-15 at 3-4, ¶ 14.) She was concerned these "tasks [] would not be accomplished and . . . would fall upon [herself] or someone else in the department[]" if Plaintiff were not present on campus. (Doc. 37-6 at 23:10-12.)

Consistent with Defendant's COVID-19 pandemic policies, each supervisor was responsible for assessing the needs of their department and the feasibility of employees working remotely. As of June 11, 2020, nineteen of the thirty-six Executive Secretaries employed with Defendant were working solely on campus. Of those nineteen Executive

---

[2] *See also id.* at 129:8-11 ("I didn't specifically go through [these] criteria. I had my own criteria to support . . . what I felt the department requires to be on[-]site.").

11

Secretaries, fifteen identified as white, three identified as Black/African-American, and one identified as Hispanic/Latino.

Without approval for remote work, Plaintiff and her husband established a schedule whereby Plaintiff used her accrued paid time off on Mondays and Tuesdays and she worked on campus Wednesday through Friday. After a few weeks, Plaintiff exhausted her accrued paid time off and began using unpaid days. On other days, Ms. Czamara allowed Plaintiff to work a modified schedule from 12:00 p.m. to 5:00 p.m., resulting in Plaintiff earning less money on those days. At the end of May 2020, Ms. Czamara told Plaintiff to return to the office full-time and to do so by approximately June 15, 2020. Plaintiff complied with this request.

### 7.    Plaintiff's Emails to HR.

On April 2, 2020, Plaintiff reached out to HR employee Corrine Latini by phone and subsequently by email, in which she wrote:

> Corrine – please pardon me[.] I was trying to be discreet as my area is kind of open, and I was also rushing. Below is a better version as the previous had typos. Thanks[.]

> See below:

> Thank you for taking my call. First let me start by saying thank you for allowing me to speak to you in strictest confidence. It is hard to trust, I think because others know that I use[d] to work with Dr. Underwood[.] Sometimes I feel adversity just because I worked with him (no fault of my o[w]n)[,] so I am concerned about who I can talk to.

> Nevertheless, I have dealt with you before, and I feel comfortable. As you know[,] we are all dealing with the COVID-19 situation wherever we are[;] it is all around us. I know that Roswell has been keeping us updated constantly. I am sure there are many protocols in place as things vary by each department and their needs. So some may be deemed essential or non-essential.

> Our department ha[s] met and we were told we are essential[.] I also asked about my position and I was told I am essential. With that being [s]aid[,] I have been coming to work and playing my part. However[,] since March 15[th] everything changed with my dynamics due to my son being home from school (please see detailed email below). In addition, I also have [leave under the Family Medical Leave Act ("FMLA")] for my son because of allergies, and he also has [an] inhaler and Epi[P]en.

12

I am asking that you read my email below and give me feedback[.] I do not want any backlash for consulting you[,] but I feel like I should be able to work remotely based on what I explained below. I met with my supervisor and I was told that[,] due to the nature of what I do for the department[,] all that would be available to me right now is an alternate schedule[,] perhaps 12[-]5pm, or take a week off and use my accruals to help my son, and[/]or check with my husband to see what days he can take off. I was also told to consider a few days on, a few days off.

So please read my email and tell me what you think about the email. I need your guidance because I know of others who may not have the dynamics I have and they are working from home. (One more thing[:] I was told to set up remote access for the whole department just in case on 3/24/2020[.] I received my laptop and already downloaded the authentication. But based on my meeting with her[,] no work from home remotely[;] just those options I mentioned).

Thank you for keeping this confidential between the both of us. Please do not mention to my supervisor that we communicated.

See email below.

(Doc. 37-10 at 5-6.) The email she provided below stated:

Hi[, Ms. Czamara],

I just wanted to follow up with you to let you know the specific details [and] status of [my son] and school/work. As you may recall[,] I did mention that the week of March 14th the parents were informed that the kids would not have school March 16th, as the teachers were meeting to prepare packets for the students. The students were supposed to go in on March 17th, but once the news came of [] COVID-19 in [Western New York], the decision was made to close school until April 20th.

The parents were told that the[] students would receive packets that they can work on from home. We picked up the packets and discussed with my in-laws, and my sister[-]in-law who is also a teacher[,] and they agreed to watch him for us and assist with his packets until we get home. On March 21, we received a text from the school to pick up a laptop and more packets for [my son]. My husband was also given all his school supplies from his desk[,] which now became an indicator that [my son] would not be returning back to school (there were rumors[,] but we were not sure[)].

With the new update we were still able to get help from my sister[-]in[-]law (as the COVID-19 cases increased and the news on the Roswell cases, we no longer sent him to my in-la[w]s who are elderly – 76 &[ ]80). During this time my sister-in[-]law who is a teacher as well was able to assist as she was only required to prepare packets for her students. Then on March

13

23rd we received another message from his school that[,] in addition to his packets, his school will be transferring all the platforms on[]line using [Z]oom video interaction to teach core subjects[] and other online requirements during his school hours. This now complicated things for us as my sister[-]in-law was also now required to upload work for the children, communicate online[,] and grade work via online.

I was informed that this would start on April 1st, but because I knew our department is still making decisions[,] I just let him use the packets [and] set him up until Monday after our meeting would have occurred. Therefore[,] I am asking to be able to work remotely to be able to help my son and the department as well [] starting on Monday. If my sister[-]in[-]law was not required to do the same thing[,] then everything would be done with just the packets and she would just watch him for us while he follows the instructions.

My husband's job [includes] handl[ing] the mail[,] so there is nothing he can do remotely for his job as he is essential. Thanks for your understanding[.] I just wanted to give you all the details.

*Id.* at 6-7.

In response, Ms. Latini told Plaintiff the same day that she "wish[ed] [she] had better news for [her]" but "if the department has a need to have you on[]site[,] then they have the ability to require [it]. All staff at Roswell Park are considered essential staff." *Id.* at 4. Plaintiff replied on April 9, 2020, seeking guidance on how to manage and use her accrued leave and the impact on her benefits:

Hi[,] Corrine,

I hope this email finds you well.

As we discussed last week[,] based on the email below, I did discuss with my boss again about working from home. I was given a "No" answer although I was asked to put in requests for the whole department on March 24, 2020. While I do not agree[,] I maturely respect my boss's decision and [am] just trying to move forward to do the best I can to help my family in this time of crisis while providing financially.

So moving forward to a solution for my family/work balance due to COVID-19 and not receiving the opportunity to work remotely[,] what should I do for the days that I would have to monitor my son for online school (begins April 13, 2020)?

It is Monday – Thursday[;] my husband is going to ask his job if he can get a day or two to help. On my end, would I have to use up my accruals and

then go into unpaid status? I just wanted to ask so I can have a clear understanding of what is available.

For example[,] if I am helping my son Monday – Tuesday, and my husband gets permission for Wednesday – Thursday to help out – with my accruals being used up, does this affect my full[-]time benefits?

These are just some concerns that I would like to get clarity on. Thanks in advance for reading my message and any advice you may have.

Have a blessed day!

*Id.* at 3-4. Approximately two hours later, Ms. Latini advised Plaintiff that she thought she "can request time off and use accruals[,]" but warned that Ms. Czamara "could very well decline approval[.]" *Id.* at 3. She also counseled that "if/when [Plaintiff] run[s] out of accruals, [she] would have to request leave without pay through that process." *Id.* Plaintiff replied, thanking Ms. Latini for her time. *Id.* at 2.

On April 10, 2020, Plaintiff emailed Jewel Askew, another HR employee: "Jewel,[] Please do not share with Corrine that we talked. See email below[.] I think I am being unfairly treated.[] Do you kn[o]w if there is anything in place for employees with children?" (Doc. 37-11 at 3.)[3] After Ms. Askew asked Plaintiff why she believed she was being treated unfairly, Plaintiff recounted:

> I requested to work remotely – my s[o]n just turned [ten,] so with his school being closed[,] we were getting help [from] my sister-in[-]law because he only had packets and she was able to assist while we worked. So as time go[es] by[,] th[e] school decided to move everything on[]line[,] which would require us to be there, as my sister-in[-]law who was helping is now required to teach online to her students[,] which would conflict with her working with my son.

> I talked with my boss[. S]he said she would think about it. Then on March 24[th] she told me to put in COVID-19 remote request[s] for the department. I did[. T]hen within a week the requests were done for everyone including myself. They told me to pick []up my laptop – so I did [] last Monday.

---

[3] Plaintiff claims that she "forwarded [Ms. Askew her] prior email . . . to Ms. Czamara with the history of [her] request to work remotely." (Doc. 40-1 at 22, ¶ 111.) The exhibit does not include the forwarded email but does include the direction to "[s]ee email below[.]" (Doc. 40-11 at 3.)

No[w], she has denied me remote access[] and has given it to others who do not even have the same situation as mine. Plus [] someone was COVID-19 positive.

*Id.* at 8. Ms. Askew replied, "Well, maybe eventually she will allow you to do so soon[]" and explained her own situation with remote education for her son. *Id.* at 7. She encouraged Plaintiff to "[j]ust pray on it and keep doing a great job at work!" *Id.*

### 8. Plaintiff's Resignation.

Plaintiff felt "tremendous stress and anxiety about exposing [her] son to [COVID-19]," as well as desperation, isolation, and frustration from the inability to work remotely. (Doc. 40-1 at 23, ¶ 118.) Her "stress further increased when one of the employees in [her] department tested positive for [COVID-19]." *Id.* at ¶ 119. She felt that Ms. Czamara and Defendant "didn't want [her] to work there and that [she] could no longer stay in that environment where [she] had been treated so differently because of [her] race." *Id.* at 24, ¶ 123. There is no evidence that she expressed a concern regarding racial discrimination at this time verbally or in writing.

On June 11, 2020, Plaintiff submitted her resignation letter, dated June 10, 2020, to Mr. Douglas by email. Also copied on the email were Ms. Czamara; Pamela Giesie, Ms. Czamara's supervisor; and Candance Johnson, Defendant's Chief Executive Officer. In the body of the email, Plaintiff wrote, "It is with regret[] that I would like to inform you of [my] resignation. Please see attached letter. Have a blessed evening." (Doc. 40-17 at 2.) The attached resignation letter states in full:

To Whom It May Concern:

Effective Wednesday, June 24, 2020, I am resigning from my position as Executive Secretary with the department of Case Management. I have enjoyed working to serve the needs of our cancer patients and contributing to the greater community [as] a whole. Nevertheless, my decision to resign has been largely impacted by the circumstances of the COVID-19 pandemic and the lack of support that I received from my employer to provide a sense of equality and safety for myself and that of my family. During the COVID-19 experience, many agencies worked efficiently, and quickly, to take great measures to protect the life of their staff and their family members[] by providing remote access opportunity to allow their worker[s] to continue their employment[,] especially those with

16

school[-]age[d] children and those who are high risk[]. My experience at Roswell during this pandemic has been one of great concern with the lack of compassion, empathy, and equity for my safety and that of my family members. I have watched and experienced every other person in my department and many others outside my department[] [be] given the opportunity to remotely support their job responsibilities and also their family members. Most of their jobs were more critical and essential to the needs of Roswell Park and their patients, and yet they were allowed to work remotely. I, on the contrary[,] was denied remote access and subjected to using all my accruals[,] which resulted in unpaid leave. With no other options, I went along with it as the best available choice for my family.

As you can imagine, I truly love my role and supporting the needs of our patients, but during this time there was no reciprocity or concern for the safety of my life[] and that of my family members. The safety and the lives of myself[] and [my] family members[] are just as equally as important as the lives of those in my department and elsewhere. This situation over[] time began to weigh on my heart as I tried to push pas[t] the unfairness[] and lack of equality. I did not ask for a gold spoon in my mouth[.] []I was just expecting the same treatment[] and value as my other colleagues.

Furthermore[,] my son is high risk[] and ha[s] many challenges, which would make him vulnerable to COVID-19. This was expressed multiple times[,] but it was not enough to grant me the equal opportunity to work from home as was given to my other colleagues. It was especially of great concern when I was tasked to process the remote access for my department, was given a laptop, but was informed that I would not be able to work remotely. So I had the laptop available, followed all the instructions from IT to use it[,] but was not granted the privilege to do so. In addition, I was even more fearful when I learned that [] COVID-19 had impacted a fellow employee in my department. My fears intensified as I was now given a tracking sheet to monitor myself for [fourteen] days. It was horrifying each day wondering what would happen to me and my family if I became a carrier.

At that point in time, all I could think was that we all needed remote access because we all at some point interacted with that employee. To find solace and encouragement from my despair, I relied heavily on my faith and prayers to calm my heart and to reassure my family that we were going to make it through somehow, while still supporting my employer to the best of my ability. However[,] there was no reciprocity of concern for myself and family as I could not remove the imagery of seeing the empty offices[] and remembering numerous telephonic contact with other administrative staff who responded to me from home as they were granted remote access. They were given the opportunity to support their employer while ensuring the

17

safety of their lives[] and that of their family members. I wondered to myself[] if it was a dream[;] perhaps my life didn't matter as much as the other employees. But[] I came to the conclusion that I was just not going to receive equal treatment and value[,] which makes Roswell Park a hostile work environment for me at this time.

These are trying times for everyone in this nation[,] and now is not the time to make anyone's life more stressful than it already is with the looming fears of COVID-19 and global protests regarding police brutality and racism. I do not write this letter in anger or animosity towards anyone as that is not my character or demeanor. But what I want to bring attention to are the inequalities and unfair treatment in the workforce culture at Roswell Park[,] especially towards minorities that I have personally observed and experienced. Being tasked to process remote access for my department, watching others being granted remote access[,] and not being able to partake of that opportunity was very disappointing. It is like asking someone to go hunting for food, and after they have returned with the resources, they are told that they cannot partake of the provisions. After much consideration and talks with my husband regarding the best interest and safety of our family, I have decided to move forward from Roswell Park.

In conclusion, I would like to thank Roswell for the opportunity of employment [in an] administrative capacity to support the community and patients battling cancer. Although I may have not received fair treatment during this time, [] it does not negate my dedication[] and commitment to providing Roswell Park with kindness and fortitude to continue my job responsibilities until my date of separation. I value the life of all whom I work with no matter the ethnicity, age, ability[,] or any other unique difference. We all have a path to walk in this life and to continue to treat each other with respect and dignity. I choose to continue my journey of love and kindness towards others despite the many challenges. Dr. Cand[a]ce Johnson, CEO[,] recently put out the following statement; however, per my experience with this organization since I started in 2017, particularly with non-[B]lack colleagues, this does not ring true! But it is my hope and prayer that one day this will be the intricate, ultimate, transparent, integral, and moral fabric of Roswell Park Comprehensive Cancer Center[, t]he kind of fabric that everyone is proud to wear and be a part of from a sincere heart.

"It is with great sadness that we witness recent national incidents of violence and racial injustice in our country. Roswell Park has always been a place of healing and hope, committed to justice, fairness[,] and love for our fellow person. We strongly affirm our stance against these cruel and senseless injustices that have affected Black Americans so deeply. We

boldly reject any and all forms of racism, while at the same time, doing all that we can to promote health, peace[,] and collaboration.

In these times, it is important not to remain silent. In doing so, it is possible to perpetuate the injustices that have existed among Black Americans, as well as many other groups. At Roswell Park, we are a patchwork of cultures and a family of different individuals, all bringing our full selves to work each day for the benefit of our mission.["]

I pray that one day this statement will prove true for all employees serving Roswell Park Comprehensive Cancer Center.

Sincere Regards,

Marsha Gayles

(Doc. 37-12 at 2-4) (emphasis omitted).

On June 12, 2020, Mr. Douglas instructed David Scott, then the Director of Diversity, Equity[,] and Inclusion ("DEI"), to "reach out to [Plaintiff] sometime today to schedule a follow[-]up regarding her resignation." (Doc. 40-17 at 2.) He thought Mr. Scott "may first reach out to [Ms.] Czamara to get her perspective and then [Plaintiff]." *Id.*

That same day, Mr. Scott conducted an approximately twenty-minute telephone call with Ms. Czamara and thereafter prepared a page of handwritten notes concerning it. He asked Ms. Czamara if Plaintiff had ever complained about being treated unfairly, but did not ask her if she treated Plaintiff differently than "Caucasian coworkers[.]" (Doc. 40-6 at 63:17.) He also did not ask Ms. Czamara about Plaintiff's allegation in her resignation letter that there was a culture of "inequalities and unfair treatment" towards minorities. (Doc. 37-12 at 3.) He asked Ms. Czamara about the criteria she used to determine whether an employee could work remotely, but noted in his deposition that he "did not get a specific answer, other than what [he] did put in [his] notes, in regards to what she allowed." (Doc. 40-6 at 64:2-4.) He did not ask whether any other individuals in the Case Management Department were allowed to work remotely.

On June 15, 2020, Mr. Scott sought to schedule a meeting with Plaintiff, explaining that he "just wanted to talk to [her] about [her] resignation and talk about [s]pecifics when [she] stated [she] feel[s] that [she has] been treated unfairly." (Doc. 40-

19

19 at 5.) He informed her that Defendant "strive[s] to make Roswell a pleasant place to work for all and for everyone to feel that they are included. [He] would like [her] insight on what [Defendant] can do better and what would[ have] made a difference for [her] to make [her] s[t]ay versus leave the organization." *Id.*

On June 17, 2020, Mr. Scott and Plaintiff met in Mr. Scott's office to discuss the issues that had led to her letter of resignation, resulting in two pages of handwritten notes from Mr. Scott. According to Mr. Scott's notes, he told Plaintiff that he "wanted to get some insight from [her] regarding [her] letter and see if there is anything that [he] can do to help persuade [her] not to resign." (Doc. 41-5 at 2.) Plaintiff told him she "would not leave if [she] felt [she] was being treated fairly[]" and that she felt like she had been treated unfairly "[f]rom the very beginning of being employed at the organization[.]" *Id.* at 2-3. Plaintiff told Mr. Scott that she never told anyone that she felt she was being treated unfairly and stated that she instead relied on her "faith to cope with issues[]" and described herself as "a reserved person." *Id.* at 3. Mr. Scott then asked Plaintiff to share specifics about the issues she was dealing with in order to address her concerns or make the situation better for the next person, but Plaintiff declined to give specifics stating that she "would rather move on[]" and "just leave." *Id.* He did not ask Plaintiff whether there were any other witnesses he could speak to about her complaint. Although Plaintiff declined to participate in an investigation, Mr. Scott acknowledged that he could "[s]ometimes" still move forward with an investigation "depending on the information that [he] had." (Doc. 40-6 at 83:14-19.)

Plaintiff alleges that, during their meeting, Mr. Scott told her that "it doesn't get any better than Roswell." (Doc. 40-5 at 142:2-3.) Mr. Scott denies that he said that, but did recall telling her that Defendant "was the best place that [he] had ever worked[]." (Doc. 40-6 at 82:6-7) (internal quotation marks omitted). Plaintiff interpreted Mr. Scott's comments as telling her "as a Black person[,] you have a good thing here and you should accept what they[ are] willing to give you." (Doc. 40-1 at 28, ¶ 144.) At the conclusion of their meeting, Mr. Scott gave Plaintiff his card in case she changed her mind, but she did

20

not reach out to him again. Plaintiff never raised any concerns with Mr. Scott about the meeting because she believed it to be "a dead-end meeting." (Doc. 37-5 at 40:21.)

Following his meeting with Plaintiff, Mr. Scott asked Jamie Evans, an employee in the Benefits Department, whether Plaintiff had sought any work accommodations. Ms. Evans confirmed that Plaintiff had and told Mr. Scott that she would discuss it with him if there was "a full-blown investigation." (Doc. 40-6 at 67:19-20.) Mr. Scott did not speak further with Ms. Evans about Plaintiff.

Mr. Scott does not recall whether he spoke with Ms. Latini, and he was not aware of Plaintiff making any complaints to Ms. Latini or Ms. Askew. He did not review any emails between Ms. Czamara and Plaintiff, which Mr. Douglas would have expected him to do if the emails "were pertinent and available." (Doc. 40-7 at 103:21). He also did not review Plaintiff's job duties, although he did look at her job description and concluded that "it was an administrative support role that was on campus." (Doc. 40-6 at 93:10-11.) Mr. Scott was aware that Plaintiff felt she was being treated differently than other employees in the Case Management Department and employees in the Social Work Department and learned that the Executive Secretary of the Social Work Department was permitted to work remotely. He did not, however, interview anyone from the Social Work Department and did not know whether the Executive Secretary of the Social Work Department was being paid while she worked remotely.

Mr. Scott considered Plaintiff's complaint to be "informal[,]" *id.* at 90:9, which he defined as

> when someone came to [the DEI Department][] and [they] didn't really find anything in particular that was a legal issue. []But it may have been an ethical [issue] or an issue where [they] needed to possibly do a mediation. Bring about awareness. Not something that was a chronic issue. Maybe if something happened one time. []And it wouldn't be considered harassment, but it could [] become harassment if someone continued.

*Id.* at 30:11-22. In contrast, he believed a formal complaint was

> when [DEI Department employees] would meet with all of the witnesses that were brought forth in a situation. [They] would also talk about what next steps [they] were going to do. [][They] would acknowledge, based on

21

the information that [they] received, that it would be a formal
complaint[][a]nd talk about any next steps that [they] may have.

*Id.* at 31:18-32:2. In determining whether a complaint was informal or formal, Mr. Scott did not rely on whether an employee was a member of a protected class or used the words "discrimination" or "race" but, rather, would be "based on what [the employee] described." *Id.* at 33:11-18 (internal quotation marks omitted).

Although it was a department practice to "write down any findings" related to an informal complaint, Mr. Scott did not produce a written report detailing the results of his investigation. *Id.* at 31:5-6. He orally communicated the nature of his conversation with Plaintiff to Mr. Douglas and concluded he "had no evidence that Ms. Czamara treated [Plaintiff] differently . . . on [the basis of] her race[.]" *Id.* at 125:8-11. Mr. Douglas did not know whether Mr. Scott "ultimately determined that [Plaintiff's] complaint did not warrant a full investigation[.]" (Doc. 40-7 at 106:12-14.)

Plaintiff's Notice of Voluntary Separation, signed by both Plaintiff and Ms. Czamara, was dated June 17, 2020, and recorded Plaintiff's last day as June 24, 2020. Ms. Czamara neither spoke with Plaintiff about her resignation letter nor asked Plaintiff to reconsider her decision to resign. Ms. Czamara did, however, attempt to conduct a written evaluation of Plaintiff after she submitted her letter of resignation and prior to her last day of employment. Mr. Douglas did not know if it was customary for supervisors to conduct an annual evaluation of an employee at the time of their resignation but had heard of it happening even after an employee had separated from the organization.

On June 23, 2020, Plaintiff emailed Ms. Czamara, expressing discomfort with doing an evaluation "the day before [her] last day[.]" (Doc. 40-25 at 2.) She also raised concerns with how Ms. Czamara described her job duties, writing:

> I revisited the objectives for my job objectives/description that you sent yesterday, and I would like to ask you about the verb[i]age that was used in the job objectives that is incorrect in stating that I serve as front-line for patients/Roswell [P]ark community. I do not work directly with patients. In addition, it also states that I triage calls[.] I do not agree with this, as I am not authorized to assess any patients['] records other than the regular

22

[electronic health records] for admission, discharge, and discharge disposition.

My understanding from the job announcement is that I serve[] as direct point of contact for you, the [D]irector, and the administrative contact for you and the Department of Case Management. I answer and distribute calls from the insurance providers[] and assist with the [utilization review], and the distribution of authorizations for patient[s'] stay[,] etc. If a patient calls our office by mistake, I route their calls to the appropriate department just like all the other administrative staff at Roswell. But I do not believe that should be classified as "Triage."

From my understanding, Triage is more often related to the clinics and direct patient care where they are qualified and trained to assess the patients. My duties are more related to managing the office and administration. Also, I was not informed about cross-training for Social Work being in my objectives. I was only made aware of being hired for Case Management and then found out about assisting with Social Work after I started – which I understood you were the Director [of] as well[,] so I assisted when Dena was away to the best of my ability. I also continued to assist even when Brian took over as Director for Social Work.

Also[,] [Ms. Czamara], please remember in all fairness, Social Work admin staff did not cross[-]train for my duties. Other than regular [timekeeping] which everyone does[] and checking my voice mail, Dena did not complete any of my other duties or cross[-]train[]. When I was off, my work was not completed by Social Work. However[,] when the admins staff for Social Work is off[,] there is great expectancy for me to cover all their work and to be able to maintain my responsibilities as well.

Nevertheless, I did them anyway because I am a sincere person[] and did not want patient needs to go unserved. I am just expressing these concerns from a pure mind and heart.

Thanks.

*Id.* at 2-3.

### 9.     Plaintiff's Proffered Comparators.

There were approximately thirteen case managers in the Case Management Department when Plaintiff was the department's Executive Secretary. Ms. Czamara allowed two case managers, Ms. Kruszka and Ms. Mulzac, to work remotely on a rotating basis at the onset of the COVID-19 pandemic, during which they performed utilization

23

review. Ms. Kruszka and Ms. Mulzac, who are "Caucasian" and had school-aged children in 2020, returned to campus by the end of April 2020. (Doc. 40 at 23.)

Although the Case Management and Social Work Departments were stationed on different floors, they worked closely together as both were patient-facing. Between the summer of 2018 and October 2019, Ms. Czamara oversaw both departments. After October 2019, she interacted daily with the new Director of the Social Work Department. Case managers and social workers "worked collaboratively[]" and met "to discuss the patients' . . . status and care needs[.]" (Doc. 40-8 at 42:19-22.) They sometimes used faxes and emails to communicate.

Plaintiff's duties overlapped with those of Ms. Hewett, the Executive Secretary in the Social Work Department. The two worked closely together, and Plaintiff claims she "frequently" covered Ms. Hewett's duties, which were similar to hers "except for obtaining translators, lodging[,] and/or transportation for the patients[.]" (Doc. 40 at 15.) They covered one another's duties even after Ms. Czamara no longer oversaw both the Case Management and Social Work Departments, although on a more limited basis. Ms. Hewett, who is "Caucasian[,]" *id.* at 23, worked remotely between approximately March and May 2020, after which she returned to working in person.

### 10.    The Cozen Report.

In April 2021, the Diversity and Inclusion Committee of Defendant's Board of Directors retained law firm Cozen O'Connor to "review, evaluate, and set forth recommendations regarding the existing policies and procedures related to investigating and addressing discrimination complaints at [Defendant]." (Doc. 40-14 at 3.) Cozen O'Connor produced a report of its findings in April 2022 (the "Cozen Report") and concluded that:

> The current system is a well-intentioned but ineffectual patchwork quilt of unnecessarily confusing, and at times conflicting, procedures that lack credibility within the Roswell Park community. The infirmities in the existing policies and procedures are multifaceted. As an initial matter, the policies and procedures are internally inconsistent. On their face, they cause confusion as to which department to lodge relevant complaints; which policy controls in each specific situation; and they reflect inconsistencies

24

between the policies regarding the manner in which to process investigations. The confusion occasioned by the policies themselves is compounded by the manner in which investigations actually unfold in practice; that is, the policies are inconsistently followed in application. Further, there are inadequacies in the documentation process regarding complaints and investigations, and a system-wide tendency to favor mediation and conciliatory efforts over robust investigation and disciplinary resolution.

*Id.* The Cozen Report also opined that there was a "shared perception among some members of the Roswell Park community" that "discrimination and related misconduct . . . are not adequately addressed at Roswell Park and lodging a related complaint will prove futile at best or, at worst, result in retaliation." *Id.* The law firm believed "line edits to the existing policies and procedures" were insufficient and instead recommended "top-down significant structural change in the handling of these issues . . . in order to restore community confidence in racial and gender relations within the organization and in the handling of allegations of discrimination in the work[]place." *Id.* at 4.

Plaintiff introduces the Cozen Report to support her claim that her "difficulty navigating [Defendant's] broken [reporting] system, along with [Defendant's] immediate processing of her separation while its investigator was still interviewing her, further shows that [Defendant] had no intention of addressing her complaints or retaining her." (Doc. 40 at 8.) She also proffers it as evidence of her lack of awareness of and confusion regarding the avenues to report discrimination to Defendant.

"[G]eneralized descriptions of pervasive [bias] within [an employer] are not sufficient to support an inference" that a specific adverse employment action was "tainted" by such bias. *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003). To the extent Plaintiff relies upon the Cozen Report to excuse her alleged failure to report discrimination, she cites no circumstances that prevented her from complaining. Instead, she acknowledges that she did not report discrimination prior to her resignation letter because she was a "reserved person" and was relying upon her religious faith. (Doc. 41-5 at 3.)

25

## C.    The Disputed Facts.

### 1.    Plaintiff's Phone Calls with Ms. Latini.

Plaintiff attests that, while she waited to find a new position following Dr. Underwood's departure, she "communicated regularly" with Ms. Latini. (Doc. 40-1 at 3, ¶ 14.) She claims that she "expressed to Ms. Latini how difficult it had been for [her] while working with Dr. Underwood, who seemed to be ostracized within the institute." *Id.* at ¶ 16. Plaintiff observed that she and Dr. Underwood "were both African[-]American employees working in a facility where very few employees looked like [they] did[]" but she does not claim that she communicated this observation to Ms. Latini.

In her deposition, Plaintiff testified that she did not recall whether she told Ms. Latini over the phone that she felt she was being treated differently because of her race "but [she] knew that [she] had said it in the e-mail." (Doc. 40-5 at 80:22-23.) The court will therefore disregard Plaintiff's statement that she spoke about race with Ms. Latini over the phone. *See Hayes*, 84 F.3d at 619 ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). Plaintiff's emails with Ms. Latini do not contain a discussion of race other than a vague reference to "adversity" because of Dr. Underwood. (Doc. 37-10 at 5.)

### 2.    Whether Ms. Czamara Hired Plaintiff.

Defendant states that Ms. Czamara interviewed and hired Plaintiff for the Case Management Executive Secretary role while Plaintiff contends HR assigned her to the department and that she did not "apply[] or formally interview[]." (Doc. 40-3 at 48.) Plaintiff's position is consistent with her disposition testimony that HR "told" her she would be going to the Case Management Department, (Doc. 37-5 at 5:9), while Defendant's position is consistent with Ms. Czamara's deposition testimony, in which she stated that she received a call from HR asking if she would interview Plaintiff and subsequently did so.

According to Ms. Czamara, no one assigned Plaintiff to the Case Management Department, and it was her decision whether to hire Plaintiff. Ms. Czamara's statement

26

that she retained final decision-making authority over whether Plaintiff joined the Case Management Department is not contradicted by Plaintiff's claim that she neither applied nor interviewed for the position. It is undisputed that Ms. Czamara was the ultimate decision-maker as to whether Plaintiff was hired. Accordingly, Defendant is correct that the "same actor" inference may apply. *See Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003) ("[W]hen the person who made the [adverse employment action] was the same person who made the decision to hire, . . . it is difficult to impute to [her] an invidious . . . motivation that would be inconsistent with [her] decision to hire."); *see also Cordell v. Verizon Commc'ns, Inc.*, 331 F. App'x. 56, 58 (2d Cir. 2009) (observing that the "same actor" principle "remains a highly relevant factor in adjudicating a motion for summary judgment") (internal quotation marks omitted).

### 3.    The Working Relationship Between the Case Management Department and the Social Work Department.

According to Plaintiff, the Executive Secretaries of the Case Management and Social Work departments would perform "duties that belonged primarily to one or the other, . . . even after Ms. Czamara no longer supervised both departments." (Doc. 40-3 at 9, ¶ 48.) Plaintiff claims she would cover Ms. Hewett's "duties when she was out or needed assistance[,]" *id.* at 10, ¶ 52, which were "very similar to her duties in the Case Management Department, except for obtaining translators, lodging[,] and/or transportation for the patients." *Id.* at ¶ 53. She notes that Ms. Hewett's duties included "answering phone calls, retrieving mail, delivering and receiving faxes, calendaring appointments, and entering data for the Social Workers." *Id.* at ¶ 54. Defendant disputes this characterization because "very similar" is a statement of opinion rather than fact and Plaintiff lacks personal knowledge regarding Ms. Hewett's duties. Defendant does not dispute, however, that Plaintiff has accurately described duties of Ms. Hewett which Plaintiff covered when required to do so.

### 4.    Ms. Czamara's Knowledge of Plaintiff's Son's Medical Conditions.

It is undisputed that within a few months of beginning work in the Case Management Department, Plaintiff applied for intermittent leave under the FMLA to care

for her son and informed Ms. Czamara of at least some of her son's medical conditions. Plaintiff contends that she informed Ms. Czamara that her son was "immunocompromised and had severe asthma and allergies and was required to always carry an inhaler, an EpiPen, and other medications with him as his condition, if untreated, was potentially deadly." (Doc. 40-3 at 6, ¶ 31.) Ms. Czamara testified that she recalled only that Plaintiff's son had allergies, but did not recall any conversation about his asthma or use of an EpiPen. *See* Doc. 40-8 at 61:11-16. The extent of Ms. Czamara's knowledge of Plaintiff's son's medical conditions at the time she denied Plaintiff's request to work remotely is disputed but not material because Plaintiff's claims are not based on her son's alleged disability.

### 5. Whether Ms. Czamara Approved Plaintiff to Work Remotely.

Defendant's records show that, on March 24, 2020, Ms. Czamara approved a "COVID Emergency Work From Home Request" for Plaintiff. (Doc. 40-22 at 2.) Plaintiff's attorney asked Ms. Czamara about this approval, and Ms. Czamara stated that she "approved [Plaintiff] getting a computer for the potential" of remote work and that this email represented only her approval of Plaintiff obtaining a computer, not working remotely. (Doc. 40-8 at 120:8-9.) Plaintiff proffers no evidence that she was affirmatively authorized to work remotely. To the contrary, she contends she was not.

### 6. Whether Ms. Czamara Explained Why Plaintiff Was Denied Remote Work.

In her declaration, Plaintiff asserts that Ms. Czamara "provided no explanation or reason" as to why she would not allow Plaintiff to work remotely "other than the fact that she was not comfortable with [Plaintiff] working remotely." (Doc. 40-1 at 15, ¶ 75.) Defendant challenges this assertion, citing Plaintiff's email from April 2, 2020, in which she writes that she "met with [her] supervisor and [she] was told that due to the nature of what [she] do[es] for the department[,]" working remotely was not possible. (Doc. 37-10 at 5.) Although Plaintiff testified that Ms. Czamara told her "she was not comfortable with [her] working from home[,]" (Doc. 37-5 at 23:19-20), Ms. Czamara does not recall telling Plaintiff this.

28

### 7.    Whether Plaintiff's Duties Could Be Performed Remotely.

According to Plaintiff, IT "assured" her that "she would be able to access everything from her computer as if she were working directly from the office." (Doc. 40-3 at 15, ¶ 84.) She similarly asserts that all of her duties with the exception of collecting and distributing the mail could be performed remotely. Although Ms. Czamara acknowledged that she had "heard" that phone calls and faxes could be sent digitally through computers, she maintains that it was her determination that some of Plaintiff's duties could not be performed remotely, including fielding items from the pneumatic tube system, accepting and distributing mail, and processing hard copies of patient records to payors. (Doc. 40-8 at 98:8.) Ms. Czamara concluded that the department would suffer without Plaintiff's presence on-site because the responsibilities either would not be completed or would fall to someone else. Plaintiff acknowledges that some of her duties could only be performed in person and contends she could have come into the office several times a week to perform them.

### D.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

29

477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

E. **Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Race-Based Discrimination Claims Under Title VII and the NYSHRL (Counts I and II).**

Both Title VII and the NYSHRL prohibit discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1); N.Y. Exec. Law § 296(1)(a). Claims for race-based discrimination under the NYSHRL are analyzed in the same manner as Title VII claims. *See Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008), *as amended* (Apr. 22, 2008) ("We typically treat Title VII and NY[S]HRL discrimination claims as analytically identical, applying the same standard of proof to both claims.").

30

The Second Circuit "evaluate[s] . . . Title VII . . . claims under the *McDonnell Douglas* framework." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 73-74 (2d Cir. 2015). Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "a plaintiff has the initial burden of making out a prima facie case of discrimination." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). "If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination." *Id.* "Upon the defendant's articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination arising with the establishment of the prima facie case drops from the picture." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (emphasis omitted). The burden shifts back to plaintiff to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Id.*

### 1.    Whether Plaintiff Can Establish a Prima Facie Case of Discrimination.

To establish a prima facie case of race discrimination, Plaintiff must show: "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation[.]" *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). "[T]he burden of establishing this prima facie case in employment discrimination cases is minimal." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (internal quotation marks and citations omitted).

Defendant does not dispute that Plaintiff was a member of a protected class and that she was qualified for her position. Rather, it argues that denial of Plaintiff's request to work remotely during the COVID-19 pandemic was not an adverse employment action and did not occur under circumstances that reflect discriminatory intent.

31

### a.  Adverse Employment Action.

An "adverse employment action" for a discrimination claim requires the plaintiff to have suffered "*some* harm respecting an identifiable term or condition of employment." *Back v. Hapoalim*, 2024 WL 4746263, at *2 (2d Cir. Nov. 12, 2024) (emphasis in original) (internal quotation marks omitted) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024)); *see also Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 90 (S.D.N.Y. 2024) (concluding that, although *Muldrow* concerned a transfer, its holding also "applies to Title VII discrimination cases not involving transfers") (collecting cases). The harm need not be "significant or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Back*, 2024 WL 4746263, at *2 (alterations adopted) (internal quotation marks omitted) (quoting *Muldrow*, 601 U.S. at 355). "In other words, the [action] must have left [the plaintiff] worse off, but need not have left her significantly so." *Id.* (alteration adopted) (internal quotation marks and citation omitted). "*Muldrow* therefore overruled [Second Circuit] precedent, which required that the changes to a term or condition of employment be materially adverse." *Id.*

Defendant alleges that because remote work was never a condition or benefit of Plaintiff's employment, denial of her request to work remotely did not constitute a change in the terms of her employment. Plaintiff counters that denial of her remote work request resulted in her having to deplete her accrued leave and take unpaid days, which, in turn, materially and adversely changed her work conditions.

"Prior to the COVID-19 pandemic, courts in the Second Circuit generally found that denying an employee's request to work remotely was not an adverse employment action[,]" often reasoning that an employee's ability to work remotely was a matter of convenience. *Gayles v. Roswell Park Cancer Inst. Corp.*, 2023 WL 6304020, at *4 (W.D.N.Y. Sept. 28, 2023). District courts remain divided regarding whether denial of a request to work remotely related to the COVID-19 pandemic constitutes an adverse employment action. *Compare Jones v. Brookhaven Sci. Assocs., LLC*, 2024 WL 4145777, at *9 (E.D.N.Y. Sept. 10, 2024) (holding that employer's denial of employee's June 2020

32

request to continue working remotely was not an adverse employment action under Title VII where plaintiff did not allege that the denial "subjected her to dangerous or extreme work conditions[]")[4] *with Satina v. City of New York*, 2025 WL 902893, at *6 (S.D.N.Y. Mar. 25, 2025) (holding that employee plausibly alleged an adverse employment action under the Age Discrimination in Employment Act ("ADEA"), which has the same standards for adverse employment actions as Title VII,[5] when she alleged that her February 2022 request to work remotely was denied).[6] Two of the cases finding no adverse employment action applied the Second Circuit's overruled definition as opposed to *Muldrow*'s controlling precedent in making the adverse employment action determination.[7]

It is undisputed that Defendant denied Plaintiff's request to work remotely during the height of the COVID-19 pandemic. There is no evidence that Defendant affirmatively offered Plaintiff a remote position at comparable pay and other terms and Plaintiff failed to accept it. *See, e.g., Thompson v. Shutterstock, Inc.*, 2024 WL 2943813, at *8 (S.D.N.Y.

---

[4] *See also Thompson v. Shutterstock, Inc.*, 2024 WL 2943813, at *8 (S.D.N.Y. June 10, 2024) (finding that an employer's denial of an employee's September 2021 request to continue working remotely was not, by itself, an adverse employment action under Title VII); *Hamilton v. Siemens Healthcare Diagnostics, Inc.*, 2025 WL 863572, at *10 (S.D.N.Y. Mar. 18, 2025) (holding that an employer's denial of an April 2022 request to continue working remotely was not an adverse employment action).

[5] *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 n.2 (2d Cir. 2000) (noting that "ADEA and Title VII claims are analyzed under the same legal framework"), *abrogated on other grounds by Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

[6] *See also Gayles v. Roswell Park Cancer Inst. Corp.*, 2023 WL 6304020, at *5 n.5 (W.D.N.Y. Sept. 28, 2023).

[7] *See, e.g., Jones v. Brookhaven Sci. Assocs., LLC*, 2024 WL 4145777, at *7 (E.D.N.Y. Sept. 10, 2024) (failing to apply *Muldrow*'s definition of adverse employment action and requiring the change in employment terms or conditions to be "materially adverse") (internal quotation marks omitted) (quoting *Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023)); *Hamilton*, 2025 WL 863572, at *9 (same); *but see Thompson*, 2024 WL 2943813, at *8 (applying the *Muldrow* standard but finding plaintiff failed to plead an adverse employment action where, after request to work remotely was denied, he was offered opportunity to find a remote position and there were no allegations a new position would have resulted in lower pay or adversely impacted other terms of employment).

33

June 10, 2024) (concluding that plaintiff failed to state an adverse employment action claim based upon the denial of his request to work remotely where he did not allege "that any new position would come with a decrease in pay" or "adversely impact[] the terms of his employment[]"). Under *Muldrow*'s standard, the court cannot rule, as a matter of law, that "[d]enying Plaintiff's remote-work request" did not "constitute[] a material change in the 'conditions of her employment,' regardless of whether the express terms of her contract changed." *Gayles*, 2023 WL 6304020, at *6 (alterations adopted) (citing *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006)). As the *Muldrow* court explained, the test is "some harm" not "significant[] [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow*, 601 U.S. at 355 (internal quotation marks and citation omitted). A reasonable jury could find "some harm" in granting the ability to engage in remote work to some employees while refusing it to Plaintiff who, in turn, had to use accrued leave and then unpaid leave.

### b.    Constructive Discharge.

Defendant argues that, because the court dismissed Plaintiff's hostile work environment claim, it must now, as a matter of law, dismiss her constructive discharge claim. It also asserts that a requirement to work on-site does not rise to a constructive discharge as a matter of law. Plaintiff responds that being required to work on-site during the onset of the COVID-19 pandemic caused her to fear "for her own well-being and mental health, as well as that of her son[,]" and the denial of her request while "Caucasian" coworkers were granted the ability to work remotely left her feeling "humiliated, embarrassed[,] and rejected." (Doc. 40 at 25.)

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000) (internal quotation marks omitted). An intolerable work atmosphere exists when work conditions are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.*

34

(internal quotation marks omitted). This standard "is a demanding one," *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010), and constructive discharge claims "are routinely rejected by the courts." *Wright v. Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 325 (S.D.N.Y. 2005) (collecting cases); *see also Alfieri v. SYSCO Food Servs.--Syracuse*, 192 F. Supp. 2d 14, 23 (W.D.N.Y. 2001) ("This burden [to establish constructive discharge] is not an easy one to carry.").

"[A] constructive discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993). "When a constructive discharge is found, an employee's resignation is treated—for the purpose of establishing a prima facie case of employment discrimination—as if the employer had actually discharged the employee." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987).

The Second Circuit has recognized that "constructive discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health." *Spence*, 995 F.2d at 1156 (holding that "stress-related ill health from the demands of [an employee's] voluntarily undertaken . . . performance" was not a health risk justifying constructive discharge); *see also Cabrera v. CBS Corp.*, 2018 WL 1225260, at *7 (S.D.N.Y. Feb. 26, 2018) (collecting cases holding workplace risks of harm to employees' physical condition or health were sufficient to support constructive discharge claims).

It is undisputed that Ms. Czamara was aware of the COVID-19 pandemic; however, the extent to which Ms. Czamara knew about Plaintiff's son's medical conditions and disability at the time she denied Plaintiff's request to work remotely remains disputed. Plaintiff avers that Ms. Czamara was aware that her son was "immunocompromised and had severe asthma and allergies and was required to always carry an inhaler, an EpiPen, and other medications" prior to Ms. Czamara denying her request to work remotely, (Doc. 40-3 at 6, ¶ 31), but Ms. Czamara recalled only that Plaintiff's son's medical condition concerned allergies and did not recall whether Plaintiff

35

told her he had asthma or had to carry an EpiPen. Ms. Czamara was aware, however, that Plaintiff had previously taken FMLA leave to care for her son. There is no evidence, however, that Defendant "deliberately sought to place [Plaintiff] in a position that jeopardized . . . her health." *Spence*, 995 F.2d at 1156. At best, Plaintiff has proffered evidence that her son's health contributed to her decision-making, she was aware of the potential availability of FMLA, and she does not claim she was discriminated against on this basis.

Defendant points to testimony from Ms. Czamara that she spoke with Plaintiff about potential solutions, including Plaintiff finding another job within Defendant that could be completely remote. *See* Doc. 40-8 at 132:4-8 ("[I]f she wanted to, she could explore other options within Roswell that could better meet her home needs and look for something that was done entirely . . . remotely."). Ms. Czamara had also previously discussed employment options that would better accommodate Plaintiff's family's schedule. Plaintiff has not disputed that she discussed these options with Ms. Czamara.

In certain circumstances, an involuntary transfer of positions may constitute a constructive discharge;[8] however, Plaintiff refused a transfer in this case and chose to

---

[8] Courts scrutinize whether a transfer is actually a demotion. *See, e.g., Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 496 (S.D.N.Y. 2000) ("[C]ourts have found transfers that constitute a demotion may also constitute a constructive discharge[.]"); *Buckley v. Hosp. Corp. of Am., Inc.*, 758 F.2d 1525, 1530-31, (11th Cir. 1985) (holding that plaintiff "produced sufficient evidence to create a jury question on the issue of constructive discharge[]" when she was offered "a position as staff nurse, a position which plaintiff testified she found 'humiliating' after her years of service in supervisory positions[]"). In doing so, they have focused on whether the transfer would result in a decrease in an employee's pay or benefits. *See, e.g., Claes v. Boyce Thompson Inst. for Plant Rsch.*, 88 F. Supp. 3d 121, 126 (N.D.N.Y. 2015) (holding that plaintiff's voluntary transfer to a position under which her performance would now be evaluated quarterly and her pay subject to change "may constitute an adverse employment action"). A transfer from a more desirable position to a less desirable one may also constitute a constructive discharge. *See, e.g., Goss v. Exxon Off. Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984) (finding that a sales representative transferred to less attractive territory was constructively discharged); *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999) ( "To be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement."). None of these circumstances are present here because the discussion of another position did not progress as Plaintiff chose not to pursue that option.

36

"move on." (Doc. 41-5 at 3.) This severely undermines her constructive discharge claim. *See, e.g., Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 496 (S.D.N.Y. 2000) (holding that female employee failed to establish she was constructively discharged when employer offered her an opportunity to transfer to another position because "a reasonable person would have taken some steps to determine if, in her mind, the new position would be satisfactory and would place her outside the reach of [the] allegedly intolerable behavior[]").

Although Defendant's evidence does not establish that an entirely remote position was available for Plaintiff, Plaintiff proffers no evidence that she sought to determine whether one existed. "[A] reasonable employee will usually explore . . . alternative avenues thoroughly before coming to the conclusion that resignation is the only option." *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993).

Based upon the evidence presented, even when regarded in the light most favorable to Plaintiff, Plaintiff has failed to proffer admissible evidence to satisfy the "demanding[,]" *Miller*, 408 F. App'x at 410, standard of a constructive discharge claim, which requires her to establish that Defendant created work conditions "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." *Whidbee*, 223 F.3d at 73 (internal quotation marks omitted). The court nonetheless proceeds to determine whether she can establish discriminatory intent.

### c. Inference of Discriminatory Intent.

A plaintiff may establish an inference of discrimination "by showing that the employer subjected him [or her] to disparate treatment[;] that is, treated him [or her] less favorably than a similarly situated employee outside his [or her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). "[T]he plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.* (internal quotation marks omitted). Although "there should be an objectively identifiable basis for comparability[,]" "[w]hat constitutes 'all material respects' . . . varies somewhat from case to case[.]" *Id.* at 40 (internal quotation marks omitted). This determination generally "rests on 'whether the plaintiff and those she

37

maintains were similarly situated were subject to the same workplace standards.'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (alteration adopted) (quoting *Graham*, 230 F.3d at 40).

"The plaintiff's and comparator's circumstances must bear a 'reasonably close resemblance,' but need not be 'identical.'" *Id.* (quoting *Graham*, 230 F.3d at 40). "'Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury,' but 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met[.]'" *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir. 2012) (summary order) (citation omitted) (first quoting *Mandell*, 316 F.3d at 368) (second quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

Defendant argues that the Executive Secretary in the Social Work Department was not similarly situated to Plaintiff because she reported to a different supervisor and had different responsibilities. It also contends that case managers in the Case Management Department were not similarly situated to Plaintiff because they had different responsibilities and qualifications.

Ms. Czamara has testified that the Social Work and Case Management Departments worked together closely and frequently collaborated "to serve the needs of the patients." (Doc. 40-8 at 42:10-11.) Although she briefly served as the supervisor of both departments while Defendant searched for a new Director for the Social Work Department, at all times relevant to the instant action, she was not the supervisor of the Social Work Department.

"In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated[,]" *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006), but it is not dispositive. *See Berube v. Great Atl. & Pac. Tea Co., Inc.*, 348 F. App'x 684, 686 (2d Cir. 2009) ("Under the standard set forth in *Graham*, the fact that [plaintiff] had a different supervisor from the employees he cites as comparators does not appear sufficient in itself to preclude

[plaintiff] from showing that he was subject to the same workplace standards and disciplinary procedures.").

Defendant's pandemic policies afforded each supervisor discretion in granting or denying remote work requests of the members of their department.[9] As a result, the identity of the supervisor is "material" to an inference of discrimination. *Graham*, 230 F.3d at 39 (internal quotation marks omitted); *see also Martinez-Santiago v. Zurich N. Am. Ins. Co.*, 2010 WL 184450, at *8 (S.D.N.Y. Jan. 20, 2010) (holding that when supervisors have discretion to grant alternative work arrangement requests, a similarly situated employee "must have had the same supervising team leader as the plaintiff[]"). Because Ms. Hewett had not only different duties than Plaintiff but also a different supervisor, Plaintiff has not established Ms. Hewett is a reasonably close comparator.

Plaintiff asserts that an inference of discrimination is alternatively established by Ms. Czamara's approval of remote work for Ms. Kruszka and Ms. Mulzac. As case managers, their duties included utilization review, discharge planning, and assisting with face-to-face interventions. Defendant admits that "[u]tilization review is one of the few job duties of a . . . case manager that could be done remotely." (Doc. 37-18 at 5, ¶ 31.) While Ms. Kruszka and Ms. Mulzac worked remotely, at least ten other case managers, both white and individuals of color, remained on-site to complete duties that could not be performed remotely.

Like case managers, Plaintiff also performed a variety of duties, some but not all of which Defendant claims had to be conducted on-site. Unlike case managers, however, Plaintiff was the only Executive Secretary in the department. Defendant argues that "[i]f Plaintiff was not on-site performing these tasks, they would have fallen to [Ms.] Czamara or a case manager . . ., or else would not have been performed in a timely manner." (Doc.

---

[9] While Plaintiff contends that Defendant issued standard operating procedures in March 2020 governing the approval of remote work, *see* Docs. 40-15, 40-16, the cited documents provide only guidance on what information a supervisor must provide when requesting permission for an employee to telecommute, not criteria to consider when determining whether to approve remote work privileges.

37-17 at 17.) Plaintiff concedes that some of her duties required her presence on-site. She has not explained how she could have performed some of those duties remotely. Instead, she claims that she could have fulfilled these obligations on the days she was on-site, a case manager could have covered for her, or she could have come in once a day. Although Plaintiff and the case managers reported to the same supervisor, they had different duties, and Plaintiff was the only person with her position in the Case Management Department. While it appears the case managers, Ms. Kruszka and Ms. Mulzac, are not comparators, because whether two people are "similarly situated" is generally a jury question, the court will not grant summary judgment on this basis.

Defendant alternatively argues that the "same actor" defense precludes Plaintiff from establishing a prima facie case for discrimination because Ms. Czamara both hired Plaintiff and denied her remote work request.

> [W]hen the person who made the [adverse employment action] decision . . . was the same person who made the decision to hire, especially when the [adverse employment action] occurred only a short time after the hiring, it is difficult to impute to [her] an invidious . . . motivation that would be inconsistent with [her] decision to hire.

*Jetter*, 324 F.3d at 76. The same actor "principle, however, depends on an assumption that the employer is aware of the employee's protected status at the time of her hire." *Edwards v. William Raveis Real Est., Inc.*, 2010 WL 3829060, at *8 (D. Conn. Sept. 22, 2010). It is undisputed that Ms. Czamara had final decision-making authority regarding whether Plaintiff was hired. Because "at the summary judgment stage of litigation, the same-actor inference is permissive, not mandatory, and even if the same individuals made both decisions, the [c]ourt would not be compelled to give the defendant the benefit of the inference." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 24-25 (E.D.N.Y. 2015) (internal quotation marks and alteration omitted). For this reason, the court declines to grant summary judgment on a "same actor" basis.

Plaintiff contends that Ms. Czamara's alleged remark, "I am not comfortable with you working from home[,]" also supports an inference of discrimination. The Second Circuit has stated:

40

> While it is true that the stray remarks of a decision[-]maker, without more, cannot prove a claim of employment discrimination, we have held that when other indicia of discrimination are properly presented, the remarks can no longer be deemed stray, and the jury has a right to conclude that they bear a more ominous significance.

*Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023) (internal quotation marks omitted). A "stray remark[]" is "by no means dispositive[,]" *id.* (*quoting Rasmy v. Marriott Int'l Inc.*, 952 F.3d 379, 389 (2d Cir. 2020)), and courts assessing the probative value of a remark consider:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019) (quoting *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)). "No single factor is dispositive." *Id.* (citing *Henry*, 616 F.3d at 150.) "The central question in evaluating remarks is whether they have a 'tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.'" *Rodriquez-Coss v. Sessions*, 2018 WL 3213290, at *15 (D. Conn. June 29, 2018) (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated on other grounds by Vogel v. CA, Inc.*, 662 F. App'x 72, 75 (2d Cir. 2016)).

Ms. Czamara did not recall telling Plaintiff that she was not comfortable with Plaintiff working from home. *See* Doc. 40-8 at 89:11-23. Assuming *arguendo* that she made the remark, she would have been Plaintiff's direct supervisor at the time and Plaintiff alleges Ms. Czamara made the remark in the context of her decision to deny Plaintiff remote-work privileges.

The remark "is, on its face, devoid of racial overtones[.]" *Ellis v. N.Y.C. Dep't of Educ.*, 2010 WL 2816334, at *5 (E.D.N.Y. July 16, 2010). Plaintiff compares it to a remark in *Battle v. Carroll*, which consisted of "some form of the phrase 'you people are never satisfied[,]'" and which the district court held could indicate discriminatory intent

41

when "uttered in the course of the very same conversation in which [the plaintiff] was fired and by the very person who fired her." 2014 WL 1679422, at *4 (W.D.N.Y. Apr. 28, 2014). A reference to "you people" connects a plaintiff to a broader racial group and contains a derogatory connotation regarding that broader group. The remark took place in the context of a termination. In contrast, Ms. Czamara's remark is race-neutral, individualized, and solely directed to a request for remote work to which it legitimately pertains. *See, e.g., Reynoso v. DeJoy*, 2024 WL 5089488, at *8 (E.D.N.Y. Dec. 12, 2024) (holding that comment from supervisor that "she was uncomfortable being alone with [p]laintiff" did not, on its own, "raise a plausible inference of ethnicity-based discriminatory animus"). A reasonable jury could not find an inference of discrimination based on a single race-neutral stray remark.

However, "[a] trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). The court therefore analyzes the remainder of the *McDonnell Douglas* framework.

### 2.    Whether Defendant Can Articulate a Legitimate, Nondiscriminatory Justification.

At the second stage of the *McDonnell Douglas* framework, the defendant must rebut the "presumption of discrimination" created by a prima facie case with "some legitimate, nondiscriminatory reason for the adverse employment action[.]" *Farias*, 259 F.3d at 98. The court does not assess the credibility of the evidence proffered but, rather, "ask[s] whether [the] defendant has introduced evidence that, '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Defendant proffers evidence that Plaintiff was not permitted to work remotely because she had duties that could not be performed remotely, including "sending and receiving faxes from internal and external sources, fielding and disbursing items from the department's pneumatic tube system, routing mail and disbursing it to the appropriate

person within the department, and sending hard copies of patient records to payors."
(Doc. 37-15 at 3-4, ¶ 14.) Ms. Czamara was concerned these "tasks . . . would not be
accomplished and . . . would fall upon [herself] or someone else in the department[]" if
Plaintiff were not present on-site. (Doc. 37-6 at 23:10-12.) Courts within the Second
Circuit have deemed operational needs to be a legitimate, nondiscriminatory justification.
*See, e.g., Mitchell v. SUNY Upstate Med. Univ.*, 243 F. Supp 3d. 255, 279 (N.D.N.Y.
2017), *aff'd sub nom. Mitchell v. State Univ. of N.Y. Upstate Med. Univ.*, 723 F. App'x 62
(2d Cir. 2018) (holding that reassignment "based on operational needs" was a legitimate,
nondiscriminatory justification); *Ausch v. Garland*, 619 F. Supp. 3d 277, 293 (E.D.N.Y.
2022) (finding defendant provided a legitimate, nondiscriminatory reason when adverse
employment action "was prompted by departmental needs[]"); *Renzi v. Oneida Cnty.*,
2021 WL 4477233, at *13 (N.D.N.Y. Sept. 30, 2021) (acknowledging that "staffing
needs" are "a recognized legitimate, nondiscriminatory reason[]"); *LaLanne v. Begin
Managed Programs*, 2007 WL 2154190, at *6 (S.D.N.Y. July 24, 2007) ("Given that
budgetary considerations and other business-related decisions are non-retaliatory,
legitimate bases for terminating an employee, . . . this explanation is more than sufficient
to satisfy the second part of the *McDonnell Douglas* framework.").

Plaintiff challenges Defendant's justification by offering evidence that some of her
duties could be performed remotely and that others, like retrieving and distributing the
mail, could be done when she "planned to come in once a day[.]" (Doc. 40 at 20.)
Plaintiff also cites an email from a Director in Defendant's IT department that, according
to Plaintiff, shows Ms. Czamara internally approved Plaintiff to work remotely on March
24, 2020, and thereby demonstrates that her responsibilities could be performed remotely.
*See* Doc. 40-22. Defendant counters that the approval was merely for remote use of a
Roswell laptop.

The evidence proffered by Plaintiff relates not to whether Defendant can offer a
legitimate, nondiscriminatory justification for denying Plaintiff's request to work
remotely but, rather, to the alleged pretextual reason for Defendant's decision. Because
Defendant has met its burden to provide a legitimate, nondiscriminatory justification for

43

denying Plaintiff's request to work remotely, the burden shifts to Plaintiff to demonstrate that business purpose is pretextual.

### 3.    Whether Plaintiff Can Establish Pretext.

At the third stage of the *McDonnell Douglas* framework, the burden shifts back to Plaintiff to offer evidence that would "be sufficient to permit a rational finder of fact to infer that . . . [D]efendant's [decision not to permit Plaintiff to work remotely] was more likely than not based in whole or in part on discrimination." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). To satisfy her burden, Plaintiff argues that Ms. Czamara justified her decision by shifting explanations and deviated from Defendant's business practices.

According to Plaintiff, when denying her request to work remotely, Ms. Czamara "never provided Plaintiff with any 'business reason' for the denial[]" and "merely said, 'I am not comfortable with you working from home[,]'" and that "[i]t was not until years later, after litigation was initiated and discovery began," that Defendant proffered business reasons for the denial. (Doc. 40 at 21.) Plaintiff's email from April 2, 2020, however, recounts that she "met with [her] supervisor and [she] was told that due to the nature of what [she] do[es] for the department[,]" working remotely was not possible. (Doc. 37-10 at 5.)

Plaintiff further observes that Ms. Czamara did not follow two Standard Operating Procedures issued in March 2020 concerning Defendant's telecommuting policy. Those policies, however, concern steps a supervisor must take when requesting that his or her employee be allowed to work remotely. They do not set forth the criteria to be considered in determining *whether* to allow an employee to work remotely. *See* Doc. 40-15 at 2 ("The supervisor requesting for their employee(s) to telecommute during these times should be prepared to answer the following criteria[.]"); Doc. 40-16 at 2 (same). There was, therefore, no requirement that Ms. Czamara follow these procedures when denying remote work.

Defendant's Productivity Plan, issued in April 2020, directed managers to complete a departmental productivity plan in which "any [a]ssociates [who] are able to efficiently and effectively perform the essential functions of their job from home . . . shall

44

utilize telecommuting procedures to the maximum extent possible in order to minimize the potential spread of COVID-19 and ensure the health and safety of the workforce." (Doc. 40-24 at 2.) Ms. Czamara could not recall whether she created a Productivity Plan for the Case Management Department. At best, the lack of a plan is neutral because Plaintiff has not established how the plan would have advanced her claim.

"[A] plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004). "[U]nless the defendant['s] proffered nondiscriminatory reason 'is dispositive and forecloses any issue of material fact,' summary judgment is inappropriate." *Id.* (quoting *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000)).

In this case, Plaintiff was the only person in her department with her position, some of her duties could not be performed remotely, the proffered alleged direct evidence of discriminatory intent is devoid of racial overtones, her comparators are not necessarily similar, and there is no other evidence of discriminatory intent. Based on the evidence presented, even when regarded in the light most favorable to Plaintiff, a jury could not reasonably conclude that concerns about Plaintiff's ability to work remotely "were minor[] and unimportant to [Defendant] before the development of the purported discriminatory motive[]" and that Defendant's business reason was pretextual. *Id.* In turn, Plaintiff has failed to establish an essential element of her race-based discrimination claims.

For the reasons stated above, Defendant's motion for summary judgment on Plaintiff's race-based discrimination claims under Title VII and the NYSHRL (Counts I and II) is GRANTED. For the same reasons, to the extent Counts I and II are based on Plaintiff's claim of constructive discharge, Defendant's motion for summary judgment is GRANTED.

45

**F.    Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Retaliation Claim (Count IV).**

Retaliation claims under the NYSHRL are analyzed under the same standard as Title VII claims. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under both Title VII and the NYSHRL.").

"To establish a prima facie case of retaliation, an employee must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). If the plaintiff establishes a prima facie case, "the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552-53 (2d Cir. 2010) (citation omitted). "If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action." *Id.* at 553 (internal quotation marks omitted).

At a time when she was unrepresented, Plaintiff did not report retaliation as a part of her sworn filing with the New York State Division of Human Rights and U.S. Equal Employment Opportunity Commission. Her complaint also does not clearly set forth a retaliation claim. In opposing summary judgment, Plaintiff states that the denial of her request to work remotely was retaliation for her complaints to HR and her resignation letter. "The onus is on the speaker to clarify to the employer that [s]he is complaining of unfair treatment due to h[er] membership in a protected class and that [s]he is not complaining merely of unfair treatment generally." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009).

46

### 1.    Whether Plaintiff Can Establish an Adverse Employment Action.

Defendant maintains that Plaintiff did not suffer an adverse employment action. For the purposes of a Title VII retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII" and need not "affect the terms and conditions of employment." *Id.* (internal quotation marks and citation omitted).

Because the court cannot rule, as a matter of law, that denying Plaintiff's request to work remotely during the height of the COVID-19 pandemic did not constitute an adverse employment action that could dissuade a reasonable worker from making or supporting a charge of discrimination, Defendant is not entitled to summary judgment on Plaintiff's Title VII retaliation claim on this basis.

### 2.    Whether Plaintiff Engaged in Protected Activity.

To constitute protected activity, "the employee's complaint must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by the anti-discrimination laws, as opposed to complaining about unfair or unpleasant treatment generally." *Green v. Mount Sinai Health Sys., Inc.*, 2019 WL 4392691, at *4 (S.D.N.Y. Sep. 12, 2019), *aff'd*, 826 F. App'x 124 (2d Cir. 2020) (internal quotations and citations omitted). "Absent a claim of unlawful discrimination, general complaints about employment concerns do not constitute protected activity[.]" *Brummell v. Webster Cent. Sch. Dist.*, 2009 WL 232789, at *5 (W.D.N.Y. Jan. 29, 2009). "However, an employee is not required to 'mention discrimination or use particular language' for her complaint to constitute protected activity.'" *Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 254 (S.D.N.Y. 2024) (quoting *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch.*, LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007)). Conversely, "a complaint to an employer that uses particular words such as 'discrimination' is not sufficient to put the employer on notice of the employee's protected activity if nothing in

47

the substance of that complaint suggests that the complained-of activity is unlawfully discriminatory." *Id.* at 254-55 (alterations adopted) (internal quotation marks omitted) (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013)).

In opposing Defendant's motion for summary judgment, Plaintiff argues that her complaints to HR constitute protected activity, as does her resignation letter. Plaintiff's April 2, 2020 email to Ms. Latini, however, does not mention discrimination or race but notes that Plaintiff finds it "hard to trust" other employees "because others know that [she] use[d] to work with Dr. Underwood[,] [and] sometimes [she] feel[s] adversity just because [she] worked with him[.]" (Doc. 37-10 at 5.) After briefly discussing her son's schooling and medical needs, Plaintiff writes that she "know[s] of others who may not have the dynamics [she] ha[s] and they are working from home." *Id.* Subsequent emails with Ms. Latini concerned logistics of how Plaintiff can request time off and use accrued leave. *See id.* at 2-3. Plaintiff's April 10, 2020 email to Ms. Askew similarly does not explicitly mention race, although it states her belief that she was being "unfairly treated." (Doc. 37-11 at 3.)

Plaintiff asserts that "[e]ven absent an explicit reference to her race, her allegation that she alone was denied remote-work privileges while all employees who received such privileges were Caucasian was sufficient to place Defendant on notice that she was complaining of race-based discrimination." (Doc. 40 at 29.)[10] Plaintiff does not dispute Defendant's evidence that other Executive Secretaries, both white and individuals of

---

[10] Plaintiff adds a statement regarding the disparate treatment of Caucasian workers that is not contained in the email to Ms. Latini or in the email to Ms. Czamara that she attached to the email to Ms. Latini. She alleges that she "did not use the word[s] [']discrimination['] or [']race['] in [her] email because [she] was afraid of retaliation[,]" (Doc. 40-1 at 17, ¶ 85), but did "reference[] race" in her call with Ms. Latini and told Ms. Latini she "was afraid to use the word 'discrimination[.]'" *Id.* Because this claim contradicts Plaintiff's deposition testimony that she did not recall whether she told Ms. Latini over the phone that she felt she was being treated differently because of her race "but [she] knew that [she] had said it in the e-mail[,]" (Doc. 40-5 at 80:22-23), the court disregards her assertion that she spoke about race with Ms. Latini. *See supra* II.C.1.

48

color, were required to work in person. She compares her emails to a memorandum in *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, which the court held constituted protected activity even though it did not mention race. 2024 WL 4277940, at *15 (S.D.N.Y. Sept. 23, 2024). The memorandum in question in that case "complain[ed] of 'snide' remarks that social workers[, ]who were predominantly [B]lack, . . . need[ed] to 'prove their worth' as compared to psychologists[, ]who were predominantly white[.]" *Id.* The *Kirkland* court considered that "the racial makeup of the two groups" contributed to its finding that "a reasonable juror could conclude that the [memorandum] raised discriminatory conduct." *Id.* It observed that the memorandum "may not move the needle much alone," but the fact that it "came on the heels of other express complaints of discrimination, including a confidential grievance filed . . . just two weeks prior[,]" raised an inference of discrimination. *Id.*; *see also Lenzi*, 944 F.3d at 113 (finding that plaintiff's email seeking compensation on par with her "peers" "[s]tanding alone, . . . may well be insufficient to establish that she engaged in protected activity[,]" but plaintiff's testimony that in a meeting the day before she told her supervisor that she "wanted to be treated similarly to the males[]" "reasonably suggested she was taking issue with being paid less than her *male* peers[]") (emphasis in original).

Plaintiff notes that she "was the only Black employee in her department[]" and therefore a similar inference is warranted here. (Doc. 40 at 29.) Without context, her reference to Dr. Underwood and a vague statement that she was facing "adversity[,]" (Doc. 37-10 at 5), and "being unfairly treated[,]" (Doc. 37-11 at 3), does not raise an inference of racial discrimination. "[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 284 (S.D.N.Y. 2011), *aff'd*, 470 F. App'x 20 (2d Cir. 2012) (internal quotation marks and citation omitted). Here, the vague complaints set forth in Plaintiff's emails to Ms. Latini do not allege racial discrimination, nor could they reasonably be deemed to have placed Defendant on notice that she was alleging racial discrimination. Plaintiff's emails to HR are therefore not protected activity.

49

Plaintiff asserts that her resignation letter also constitutes protected activity. Defendant argues that the letter lacks the specificity needed to render it protected activity because it does not include information like "specific individuals whom she believed were being treated differently, dates on which allegedly discriminatory behavior occurred, or witnesses to allegedly discriminatory behavior[.]" (Doc. 37-17 at 24-25.) Although Plaintiff's resignation letter does not identify specific dates or witnesses to the alleged discriminatory behavior, it clearly states that she believed her "non-[B]lack" colleagues within her department were being treated differently than she was with respect to the opportunity to work remotely during the COVID-19 pandemic. (Doc. 37-12 at 4.) In relevant part, the letter states:

> I have watched and experienced every other person *in my department* and many others outside my department[] [be] *given the opportunity to remotely support their job responsibilities* and also their family members. Most of their jobs were more critical and essential to the needs of Roswell Park and their patients, *and yet they were allowed to work remotely. I, on the contrary[,] was denied remote access* and subjected to using all my accruals[,] which resulted in unpaid leave.
>
> \*\*\*
>
> The safety and the lives of myself[] and [my] family members[] are just as equally as important as the lives of those *in my department* and elsewhere. . . . I was just expecting the same treatment[] and value as my other colleagues.
>
> Furthermore[,] my son is high risk[] and ha[s] many challenges, which would make him vulnerable to COVID-19. This was expressed multiple times[,] but it was not enough to grant me *the equal opportunity to work from home as was given to my other colleagues.*

*Id.* at 2 (emphasis supplied). Unlike Plaintiff's emails to HR, the letter suggests that her race was the reason for this discriminatory treatment. *See id.* at 3 ("But what I want to bring attention to are the inequalities and unfair treatment in the workforce culture at Roswell Park[,] especially towards minorities that I have personally observed and experienced."). Viewing the evidence in the light most favorable to Plaintiff, a reasonable fact finder could conclude that her resignation letter is "sufficiently pointed to be

50

reasonably understood as a complaint of discrimination." *Cornetta v. Town of Highlands*, 434 F. Supp. 3d 171, 187 (S.D.N.Y. 2020) (internal quotation marks and citation omitted).

### 3.    Whether Plaintiff Can Establish a Causal Connection.

With respect to the fourth element of a prima facie case of retaliation, a causal connection between the adverse employment action and the protected activity can be established "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). There can be no inference of retaliation, however, where the alleged adverse employment action occurred *before* the protected activity. *Cf. Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

Having determined that Plaintiff's emails to HR cannot constitute protected activity, Plaintiff's retaliation claim must proceed on the basis of her resignation letter, which she submitted *after* she was asked to return to in-person work full-time and *after* she had made the voluntary decision to leave Defendant's employment. No causal connection may be established on this basis. *See, e.g., Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 582 (W.D.N.Y. 2011) ("It is axiomatic that no such [causal] relationship can be found to exist where the alleged adverse employment action began and ended *prior* to the commencement of any protected activity.") (emphasis in original).

Plaintiff points to the processing of her resignation letter on the same day she met with Mr. Scott and his dismissive attitude during the interview as retaliatory conduct.[11]

---

[11] "Negative reactions by an employer to a plaintiff's complaints of discrimination have been deemed indicative of retaliatory animus." *White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 390 (S.D.N.Y. 2011) (citing *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003)) (citing an incident where defendant "yelled at [plaintiff] and said he did not know what was wrong with her after he learned that she had filed a charge with the EEOC[,]"); *see also Mandell*, 316 F.3d at

51

Mr. Scott's allegedly dismissive attitude was contemporaneous with her resignation and had no causal effect in terms of retaliation. To the contrary, Mr. Scott urged Plaintiff to rescind her resignation.

At most, Plaintiff has established that, after submitting her resignation letter, Mr. Scott told her that "it doesn't get any better than Roswell." (Doc. 40-5 at 142:2-3.) Although he failed to follow up on Plaintiff's allegations of unfair treatment of minorities, a failure to investigate, alone, does not rise to the level of retaliation, especially when an employee has made it clear that he or she does not intend to continue the employment. *See Fincher v. Depository Tr. and Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ("[A]n employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint."); *see also Thompson*, 2024 WL 2943813, at *19 (citing *Fincher*, 604 F.3d at 721-22) ("[D]isinterest alone does not suffice to establish an adverse employment action for the purposes of a federal retaliation claim."). Plaintiff has thus failed to offer admissible evidence in support of causation. *See Celotex*, 477 U.S. at 323. Because she resigned from her employment *before* any protected activity took place, Defendant's motion for summary judgment on Count IV must be GRANTED.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment and to preclude Plaintiff's expert is GRANTED. (Doc. 37.)

SO ORDERED.

Dated this _23_ day of June, 2026.

Christina Reiss, District Judge
United States District Court

---

383 (observing that supervisor told a plaintiff to "keep his mouth shut" and "that his career might be adversely affected" after he gave an interview complaining of discrimination).